**Case No.: 16-1068**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT**

---

**AGILITY DEFENSE & GOVERNMENT SERVICES, INC.**

**Plaintiff - Appellant,**

**v.**

**UNITED STATES,**

**Defendant - Appellee.**

---

**ON APPEAL FROM THE UNITED STATES
COURT OF FEDERAL CLAIMS**

**Judge Thomas C. Wheeler**

---

**BRIEF OF APPELLANT AGILITY DEFENSE & GOVERNMENT
SERVICES, INC. f/k/a TAOS INDUSTRIES**

---

W. Brad English
Jon D. Levin
J. Andrew Watson, III
Emily J. Chancey
**MAYNARD, COOPER & GALE, P.C.**
655 Gallatin Street, SW
Huntsville, Alabama 35801
(256) 551-0171 (Telephone)
(256) 512-0119 (Facsimile)

ATTORNEYS FOR APPELLANT

**Form 9**

FORM 9.  Certificate of Interest

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

_____ v. _____

No. _____

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party) _____ certifies the following (use "None" if applicable; use extra sheets if necessary):

1.    The full name of every party or amicus represented by me is:

_____

_____

_____

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

_____

_____

_____

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

_____

_____

_____

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

_____

_____

_____        _____

Date                           Signature of counsel

                                    _____

                                    Printed name of counsel

Please Note: All questions must be answered

cc: _____

124

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST .................................................................i

TABLE OF CONTENTS........................................................... ii

TABLE OF AUTHORITIES ..................................................vi

STATEMENT OF RELATED CASE ...................................x

JURISDICTIONAL STATEMENT ......................................1

STATEMENT OF THE ISSUES............................................1

STATEMENT OF THE CASE.................................................1

STATEMENT OF THE FACTS ..............................................4

    I.     Nature and Operation of DRMOs ........................................4

    II.    The Solicitation ....................................................5

    III.   Agility's Proposal Activities ................................................6

        A.    Development of Agility's Staffing Profile...................6

           1.    Information Provided to Agility .......................6

           2.    Information Not Provided to Agility .............................10

B.    Calculation of Cost of Performance and Bid Price...................13

IV.    Award and the Contract.......................................................15

V.    Phase-in and Contract Performance ....................................17

SUMMARY OF ARGUMENT ...............................................................26

ARGUMENT .........................................................................................30

I.    Statement of the Standard of Review...................................30

II.    Introduction .......................................................................31

III.    The Trial Court Erred in Holding that DRMS Did Not
Constructively Change the Contract by Withholding Its
Superior Knowledge Regarding Anticipated Quantities /
Workload ...........................................................................32

A.    The Trial Court Misconstrued Agility's
Constructive Change Theory ....................................33

1.    DRMS did provide a scrap estimate, and
it was just as "misleading" as the trial
court predicted ...............................................34

2.    DRMS knew and was required to disclose
*the effect* of anticipated troop movements.......................36

B.    The Trial Court Erred in Applying Negligent
Estimate Principles to Agility's Constructive
Change Theory ..........................................................37

C.   Analyzed Correctly, Agility is Entitled to An
Equitable Adjustment on Its Constructive
Change Theory .......................................................................40

IV.   The Trial Court's Holding On Agility's Negligent
Estimate Theory Was Contrary to Fact and Law ...............................43

A.   DRMS was Required to Provide A "Realistic"
Estimate of Quantities / Workload...........................................43

1.   The Contract was a requirements contract .....................43

2.   Because the Contract was a requirements
contract, DRMS had to comply with
48 C.F.R. § 16.503(a)(1)..................................................45

B.   DRMS *Did Provide E*stimates of Quantities /
Workload...................................................................................47

1.   The historical workloads were part of
the estimate ....................................................................48

2.   Regardless of the historical workload
data, DRMS provided an estimate of
quantities / workload by weight......................................49

C.   The Estimates Provided by DRMS Were
Negligently Prepared ................................................................49

1.   Providing only historical requirements is not
reasonable *per se*.............................................................49

2.   DRMS knew or should have known that its
estimate misstated expected quantities /
workload ........................................................................53

V.    The Trial Court Erred in Holding that DRMS Did Not Breach the
Warranty of Reasonable Accuracy.......................................................57

VI.    Agility Provided the Trial Court With a Reasonable
Basis for Calculating Quantum ...........................................................60

CONCLUSION    ...................................................................................................63

ORDER AND OPINION OF TRIAL COURT .....................................................JA1

JUDGMENT ENTERED BY TRIAL COURT...................................................JA19

PROOF OF SERVICE

CERTIFICATE OF COMPLIANCE

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases:</u>

<u>A-Transport Northwest Co., Inc. v. United States</u>,
    27 Fed. Cl. 206 (1992) ..................................................................................44

<u>Ace-Fed. Reporters, Inc. v. Barram</u>,
    226 F.3d 1329 (Fed. Cir. 2000) ...........................................................43, 44

<u>Allied Tech. Grp., Inc. v. United States</u>,
    94 Fed. Cl. 16 (2010) ..................................................................................44

<u>Am. Ship Bld. Co. v. United States</u>,
    228 Ct. Cl. 220 (1981) ...............................................................................37

<u>Bay Cnty., Fla. v. United States</u>,
    112 Fed. Cl. 195 (2013) ..............................................................................47

<u>Cedar Lumber, Inc. v. United States</u>,
    5 Cl. Ct. 539 (1984) ..............................................................................57, 59

<u>Chem. Tech., Inc. v. United States</u>,
    227 Ct. Cl. 120 (1981) ...............................................................................37

<u>City of El Centro v. United States</u>,
    922 F.2d 816 (Fed. Cir. 1990) ....................................................................31

<u>Crown Laundry & Dry Cleaners, Inc. v. United States</u>,
    29 Fed. Cl. 506 (1993) ...........................................................38, 39, 45, 52

<u>D'Andrea Bros. LLC v. United States</u>,
    96 Fed. Cl. 205 (2010) ...............................................................................44

Datalect Computer Servs., Ltd. v. United States,
    40 Fed. Cl. 28 (1997), ...................................................................51

Delhur Indus., Inc. v. United States,
    95 Fed. Cl. 446 (2010)...................................................................32

Everett Plywood & Door Corp. v. United States,
    190 Ct. Cl. 80 (1969) ....................................................................57

Giesler v. United States,
    232 F.3d 864 (Fed. Cir. 2000) ...................................................33, 37, 38, 39

Hercules, Inc. v. United States,
    24 F.3d 188 (Fed. Cir. 1994) ........................................................37

Hi-Shear Tech. Corp. v. United States,
    356 F.3d 1372 (Fed. Cir. 2004) ...........................................37, 38, 60

Int'l Data Prod. Corp. v. United States,
    492 F.3d 1317 (Fed. Cir. 2007) ....................................................32

LB&B Assocs. Inc. v. United States,
    91 Fed. Cl. 142 (2010)...................................................................32

Mason v. United States,
    222 Ct. Cl. 436 (1980) ............................................................43, 45

Mass. Bay Transp. Auth. v. United States,
    254 F.3d 1367 (Fed. Cir. 2001) ....................................................31

Max Jordan Bauunternehmung v. United States,
    10 Cl. Ct. 672 (1986) ....................................................................33

Medart, Inc. v. Austin,
    967 F.2d 579 (Fed. Cir. 1992) ............... 38, 39, 40, 46, 48, 49, 50, 51, 52, 53

Media Press, Inc. v. United States,
    215 Ct. Cl. 985 (1977) ...................................................................................45

Miller Elevator Co. v. United States,
    30 Fed. Cl. 662 (1994)................................................... 32, 33, 37, 39, 40, 43

Modern Sys. Tech. Corp. v. United States,
    979 F.2d 200 (Fed. Cir. 1992) .......................................................................45

Novamedix, Ltd. v. NDM Acquisition Corp.,
    166 F.3d 1177 (Fed. Cir. 1999) .....................................................................44

Northrup Grumman Corp., Military Aircraft Div. v. United States,
    63 Fed. Cl. 12 (2004).....................................................................................38

Petrochem Servs., Inc. v. United States,
    837 F.2d 1076 (Fed. Cir. 1988) ...............................................................33, 37

Raytheon Co. v. United States,
    747 F.3d 1341 (Fed. Cir. 2014) .....................................................................31

Rumsfeld v. Applied Cos., Inc.,
    325 F.3d 1328 (Fed. Cir. 2003) .............................................39, 46, 50, 51, 53

Serv. Technicians, Inc. v. United States,
    37 Fed. Cl. 383 (1997)...................................................................................48

Troise v. United States,
    21 Cl. Ct. 48 (1990) ......................................................................................57

Womack v. United States,
        389 F.2d 793, 801 (Ct. Cl. 1968)............................................................37, 50

**Statutes:**

28 U.S.C. § 1295 ...............................................................................1

41 U.S.C. § 7101 ...............................................................................1

**Regulations:**

48 C.F.R. § 1.403 ...........................................................................47

48 C.F.R. § 16.503 ................................................................29, 39, 45, 46

48 C.F.R. § 52.216-20...........................................................................44

48 C.F.R. § 201.403 ...........................................................................47

**Other:**

John Cibinic, Jr. & Ralph C. Nash, Jr.,
Admin. of Gov't Contracts, (2d. ed. 1986))............................................................40

John C. Cibinic, Jr., Ralph C. Nash, Jr. & James F. Nagle,
Admin. of Gov't Contracts, Fourth Edition,
(The George Washington University National Law Center 2006).........................57

Ralph Nash, Jr. & Steven W. Feldman,
Government Contract Changes, Third Edition, (Thompson West 2007) ...............32

## STATEMENT OF RELATED CASE

There has been no prior appeal of the underlying action to this Court or other appellate courts. Counsel for Agility Defense & Government Services, Inc. ("Agility") are not aware of any other pending actions that will directly affect, or be directly affected by, the Court's decision in this appeal.

# JURISDICTIONAL STATEMENT

Jurisdiction of this action was proper in the United States Court of Federal Claims (the "trial court") pursuant to the Contract Disputes Act, 41 U.S.C. § 7101, et seq. The trial court entered final judgment for Appellee the United States of America, by and through the Defense Logistics Agency's Defense Reutilization and Marketing Service ("DRMS"), on August 18, 2015. Agility timely filed its notice of appeal on October 15, 2015. Appellate jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1295(a)(3).

# STATEMENT OF THE ISSUES

Whether the trial court erred in holding that DRMS's failure to disclose its superior knowledge did not result in a constructive change to the contract at issue; whether the trial court erred in holding that DRMS acted reasonably in preparing estimates provided to offerors; and whether the trial court erred in holding that DRMS did not breach the warranty of reasonable accuracy.

# STATEMENT OF THE CASE

This appeal arises from a contract between Agility and DRMS. The contract at issue required Agility to operate six Defense Reutilization and Marketing Offices ("DRMOs"), located in Bagram, Afghanistan; Arifjan, Kuwait; Anaconda,

Victory Base, Al Asad and Speicher in Iraq (collectively, the "Contract DRMOs"). The contract was awarded to Agility on November 29, 2007. Agility's contract price at award was $45,233,914.92.

Agility began transition activities in Arifjan, Kuwait in January of 2008 and, by May of 2008, was operating all of the Contract DRMOs. The contract was terminated for convenience in June of 2010. During the period of performance, Agility was forced to perform substantially more work than was indicated by the information that DRMS provided offerors to use in preparing proposals.

Agility submitted two certified claims seeking compensation for work in excess of what it agreed to perform for the contract price. One claim covered the period of April of 2008 through March of 2009 (the "Pre-March 2009 Claim"). The other claim covered the period of April 2009 through the end of contract performance (the "Post-March 2009 Claim").

On June 14, 2012, the contracting officer issued a final decision on the Pre-March 2009 Claim, and awarded only $236,363.93. On June 14, 2012, the contracting officer denied the Post-March 2009 Claim in its entirety. Agility appealed both final decisions to the trial court, seeking $4,932,118.89 for its Pre-March 2009 Claim and $1,974,220.31 for its Post-March 2009 Claim.

Agility contended that it was entitled to an equitable adjustment because it based its proposal upon the information provided by DRMS, which did not reflect the actual workloads that Agility experienced when it began operating the Contract DRMOs. Agility asserted three theories in support of its Pre-March 2009 Claim: (a) constructive change; (b) negligent estimate; and (c) breach of warranty of reasonable accuracy.

In response, DRMS contended that Agility was not entitled to an equitable adjustment on either of its claims because: (a) the metrics of clause H.19 of the contract, which DRMS contended to be an economic price adjustment clause, were not met; (b) Agility profited from the sale of scrap; and (c) the contract was a firm, fixed-price contract.

The trial court conducted a three-day trial and heard all issues of liability and damages. On August 18, 2015, the trial court issued its Opinion and Order holding that DRMS had not constructively changed the contract, had not negligently estimated contract requirements, and did not breach the warranty of reasonable accuracy. Judgment in favor of DRMS followed that same day.

## STATEMENT OF THE FACTS

### I. NATURE AND OPERATION OF DRMOS.

The Defense Logistics Agency ("DLA") is an agency of the United States Department of Defense. (JA81.[1]) DRMS is a primary level field activity of DLA, and is responsible for the disposal of the military's surplus property throughout the world. (JA81.)

DRMOs receive and process military surplus property. (JA81, JA241.) Once property is received, it is either reutilized by the military, or it is demilitarized and/or reduced to scrap. (JA245-JA246.) DRMS employed two computer programs, known as "DAISY" and "MIDAS,"[2] to track property turned into a DRMO. (JA244, JA565.)

Prior to 2007, DRMS operated all DRMOs worldwide. (JA81, JA1303, JA625.) In December of 2006, the Director of DRMS determined that DRMS was not staffed to adequately support the Contract DRMOs. (JA81-JA82, JA4, JA501-JA502.) DRMS believed that "planned troop movements" would create more

---

[1] "JA" refers to the Joint Appendix to be filed separately in accordance with Federal Circuit Rule 30.

[2] DAISY was the database into which all of the information was entered, and MIDAS was the tool used to query and extract information from DAISY. (JA247-JA248, JA565.)

work at the Contract DRMOs than DRMS could handle.  (JA1304.)  DRMS

determined that a contractor could provide a more efficient solution, would enjoy

greater workforce continuity, and would be better able to handle expected

workloads.  (JA1021, JA1303.)  For those reasons, DRMS decided to outsource the

operation of the Contract DRMOs.

## II.    __THE SOLICITATION.__

On January 18, 2007, DRMS issued Solicitation SP4410-07-R-007 (the

"Solicitation").  (JA82, JA705.)  The Solicitation, as amended, was issued for a

fixed price contract based upon an Independent Government Cost Estimate

("IGCE") of $73,700,000.00.  (JA82.)  The Solicitation contained only a statement

of objectives ("SOO") and technical exhibits which described the nature of certain

activities being performed at the Contract DRMOs.  (JA503-JA505, JA752-JA753,

JA757-JA780.)  The Solicitation required offerors to develop their own

performance work statement ("PWS") (JA709.)

DRMS intended to make a single award.  (JA688, JA692.)  The SOO

indicated that the purpose of the resulting contract would be the "performance of

the DRMS mission within Southwest and Central Asia."  (JA752.)  DRMS

intended the single awardee to perform "all tasks DRMS performs in support of the

Department of Defense mission."  (JA752.)

5

## III.    AGILITY'S PROPOSAL ACTIVITIES.

### A.    Development of Agility's Staffing Profile.

Agility was one of three offerors to respond to the Solicitation.  (JA83.)

Agility engaged three subject-matter experts to help prepare its proposal.  (JA124.)

These subject-matter experts had experience in the operation of DRMOs,

generally, but no experience with the Contract DRMOs.  (JA124.)  With the help

of these three individuals, Agility developed a PWS demonstrating its approach to

meeting the SOO.  (JA124-JA125.)

Next, Agility sought to determine the level of staffing required to perform

the PWS and meet the acceptable performance levels ("APLs") identified by

DRMS.  (JA125-JA126, JA145-146, JA248, JA873-JA877.)  The APLs

established the parameters for performing the work set out in the PWS.  (JA145,

JA248, JA874.)

### 1.    Information Provided to Agility.

During proposal activities, Agility requested "workload history and

projection by category and location."  (JA127, JA810.)  By Amendment 002 dated

February 26, 2007, DRMS responded to Agility's request, directed offerors to a

website containing "[w]orkload history and current inventory levels," and

6

informed offerors that "*the Government does not have workload projections*." (JA810 (emphasis added), JA127.)  The website to which offerors were directed (the "website") contained information depicting historical workloads being processed at each of the Contract DRMOs.  (JA506-JA507, JA127-JA128.)

The historical workloads were measured in two ways:  by scrap weight and "line items."  (JA128, JA132-JA133.)  The weight measure expressed the workload by the weight of scrap processed through the Contract DRMOs during certain time periods.  (JA133, JA508.)  The "line item" measure expressed workloads by the number of items processed through each of the Contract DRMOs during that same period of time.  (JA132, JA506-JA507.)  The processing of a line item involved virtually every staff member, but the scrap process did not.  (JA133.)  Thus, although Agility considered both workload measures in preparing its proposal, the line item measure had greater significance to the staffing decisions. (JA133, JA1063, JA3268.)

The historical data also showed DRMS's staff at the Contract DRMOS, another piece of information that Agility considered in preparing its proposal. (JA131-JA132, JA136.)  The staffing information provided to and considered by Agility indicated the number of DRMS personnel at each of the Contract DRMOs,

distinguishing between the personnel "required" and those "on board."  (JA128, JA1642, JA1646, JA1653, JA1656, JA1660, JA1664.)

On or about August 4, 2007, DRMS uploaded the last set of historical workload data and staffing information (the "August 4, 2007 Historical Data"). (JA128-JA131, JA1642, JA1646, JA1653, JA1656, JA1660, JA1664.)  The August 4, 2007 Historical Data showed the historical workloads for each of the Contract DRMOs (measured in scrap weight and line items) for the period of July 13 - 26, 2007.  (JA126-JA131.)   The historical workload data provided to offerors contained no disclaimers.  (See JA1642, JA1646, JA1653, JA1656, JA1660, JA1664.)  DRMS expected that offerors would use the historical workload information to prepare their proposals.  (JA508, JA522-JA523, JA11.)

As of August 4, 2007, DRMS represented that the operation of the Contract DRMOs "required" 190 individuals, allocated as follows:

| | |
|---|---|
| Anaconda | 30 |
| Al Asad | 21 |
| Speicher | 21 |
| Victory | 12 |
| Bagram | 6 |
| Arifjan | 100 |

(JA1642, JA1646, JA1653, JA1656, JA1660, JA1664.)  The staffing information provided by DRMS did not inform offerors that DRMS had determined that its "required" staff was inadequate to process expected workloads.

In addition to the information on the website, by Amendment 007 dated July 24, 2007, DRMS provided offerors with estimated workloads measured by the weight of scrap expected to be delivered to each of the Contract DRMOs during the base year and four option years (the "Scrap Estimate").  (JA142-JA143, JA990-JA991, JA1003, JA1012.)  The Scrap Estimate projected that quantities / workload would be constant for the base and first option years, and would decline over the remaining option years.  (JA990-JA991.)  The Scrap Estimate contained no disclaimers and was provided "[f]or the purpose of assisting offerors in preparing their proposals. . .."  (JA1003.)

In formulating its staffing profile, Agility relied on the Scrap Estimate and the historical workload and staffing data, including the August 4, 2007 Historical Data.[3]  (JA134, JA142, JA147, JA178-JA180, JA191, JA1063, JA3268.)  Agility assumed that the historical workloads were processed in accordance with the APLs and developed its staffing profile so that it could do likewise.  (JA145-JA147.)

---

[3] Agility continued to monitor the website, which remained active after Agility's initial proposal was submitted on August 2, 2007.  (JA165.)  Agility's submitted its final proposal revisions on September 24, 2007.  (JA1247.)  Agility used the August 4, 2007 Historical Data in preparing its "final staffing."  (JA131.)

The historical workloads, staffing data, APLs and the Scrap Estimate were the only pieces of information upon which Agility relied in developing its staffing. (JA147.)

### 2. Information Not Provided to Agility.

On August 2, 2007, Agility submitted its initial proposal in response to the Solicitation. (JA1050-JA1051.) Marlowe Burns ("Burns"), who served as the lead Contracting Officer's Representative ("COR") and a member of the Source Selection Evaluation Team, reviewed Agility's proposal. (JA572, JA646, JA649, JA1042.) After doing so, Burns determined that Agility would be understaffed, particularly at DRMO Arifjan. (JA577-JA579, JA646.) Burns expressed his concerns to his supervisors and the DRMS director, DRMS told him that he "couldn't communicate <u>that concern</u>" to Agility. (JA646-JA647 (emphasis added).)

On August 8, 2007, DRMS prepared a "Proposal Evaluation Form Overall Technical Plan/PWS Rating" regarding Agility's proposal. (JA1179.) The evaluation form twice noted "projected workload" as a criterion against which Agility's proposal was evaluated. (JA1179.) The evaluator(s) concluded that "[b]ased on current and projected workload" Agility would be understaffed in

some areas at DRMO Arifjan.  (JA1179.)  The workload projections against which Agility's proposal was evaluated were not provided to Agility.  (JA137, JA527.)

On August 28, 2007, James Washington ("Washington"), DRMS's head of contracting activities and acting procuring contracting officer, wrote to Agility to address certain issues that DRMS had identified with Agility's proposal.  (JA157-JA160, JA1186-JA1190.)  Washington's letter did not inform Agility that DRMS's evaluators DRMS had twice determined Agility's proposed staffing to be inadequate.  (See JA1186-JA1190.)  DRMS never informed Agility of its determination that Agility would be understaffed.  (JA136.)

On October 17, 2007, Washington sought approval from the Integrated Acquisition Review Board ("I-ARB") to proceed with award of the subject contract (referred to as "Milestone B").  (JA1272.)  The I-ARB inquired as to DRMS's plans to address increased workloads, including a potential increase to "50 million pounds per month." (JA1274.)  In response, DRMS stated that "when the surge begins (next year) [DRMS] will use the T&M and cost CLINs" to address increased workloads.  (JA1274.)  DRMS never notified Agility of an anticipated surge.  (JA141-142.)

Based upon the information that DRMS provided to offerors, Agility assumed that the workload at each of the Contract DRMOs, except for Al Asad,

11

would remain constant.  (JA1175-JA1176.)  Agility expected an increase in

workload of 40-50% over the base year at DRMO Al Asad.  (JA1175-JA1176.)

Agility's initial staffing plan consisted of 174 individuals, both direct and contract

labor, allocated as follows:

Table 1

| Area of Operation | Staff |
|---|---|
| Management | 14 |
| Anaconda | 30 |
| Victory Base | 15 |
| Al Asad | 28 |
| Speicher | 15 |
| Arifjan | 68 |
| Bagram | 4 |

(JA125, JA1084-JA1087.)  Agility recognized that its proposed staff was less than

that listed as "required" on the August 4, 2007 Historical Data, but its decision to

reduce that staff was based upon the "requirements outlined in the PWS, the SOO

and the APLs", and Agility's effort to provide the efficient solution that DRMS

sought.  (JA192, JA178, JA1175-JA1176.)  In developing its proposed staff,

Agility was unaware of DRMS's determination that its "required" staff would be

unable to handle expected workloads.  (JA136.)  DRMS never informed Agility of that determination, even after reviewing its proposal.  (JA136.)

### B.    Calculation of Cost of Performance and Bid Price.

Direct and contract labor costs formed the overwhelming majority of the cost of performance.  (JA147-JA148.)  Agility determined its anticipated cost of performance by calculating the cost of employing the individuals in its staffing plan, using its experience hiring laborers for other, unrelated efforts in Iraq, Afghanistan and Kuwait.  (JA147-JA148.)

With the projected cost calculated, Agility determined its bid price. (JA148.)  Doing so required two additional data points.  First, Agility added its fee and general and administrative ("G&A") charges to its projected cost.  Secondly, the Solicitation required offerors to demonstrate a cost savings to DRMS based upon the anticipated proceeds from the sale of scrap, which the successful contractor was to receive "free and clear."  (JA150-JA151, JA1010-JA1011, JA423-JA424.)

Agility used the Scrap Estimate provided by DRMS and its analysis of the scrap market to determine the anticipated scrap proceeds.  (JA151-JA152, JA424-JA425.)  After doing so, Agility proposed to offset its cost by the total amount of $20,342,608.00 over the life of the contract.  (JA242, JA1066.)  Agility's offset

model was consistent with the Scrap Estimate, showing an identical offset for the base and first option years, with a declining offset during each of the remaining option years.  (Compare JA990-JA991 with JA1066 and JA426.)  DRMS was to receive the full offset regardless of the accuracy of Agility's revenue projections.  (JA154-JA155, JA427.)

Agility's initial proposed price was $42,159,801.00, which was Agility's cost, fee and G & A reduced by the proposed offset.  (JA1068-JA1072, JA428.)  Agility offered to discuss additional offsets if actual scrap proceeds exceeded projections by more than 20%.  (JA156, JA1066.)  Agility withdrew that offer because DRMS objected to it as a potential change to contract terms.  (JA157-JA162, JA1189, JA1198.)  After proposals were submitted, DRMS recorded increased workloads at DRMO Arifjan, in some months exceeding that shown on the August 4, 2007 Historical Data by almost one-third.  (JA591, JA686.)  DRMS did not inform Agility of the recorded increase in quantities / workload.

On September 24, 2007, Agility submitted its final proposal revisions.  (JA1247.)  Agility's final proposed price was $45,233,914.92.  (JA163, JA1254.)  The Source Selection Authority determined that Agility's proposal represented the best value to the government.  (JA1267-JA1271.)

14

IV.    **AWARD AND THE CONTRACT.**

On November 29, 2007, DRMS notified Agility that its proposal had been selected for award.  (JA83.)  Contract number SP4410-08-D-2000 (the "Contract") was fully executed that same day.  (JA1306.)  The Contract contained nine CLINs.  (JA1356-JA1357, JA1610-JA1619.)  The first seven CLINs were fixed price.  (JA1356.)  CLINs 0001-0006 were tied to the six Contract DRMOs.  (JA1356.)  CLIN 0007 was tied to transition costs.  (JA1356.)  CLIN 0008 was a time and materials ("T&M") CLIN with a ceiling, which DRMS anticipated using in the event that Agility required additional personnel to address increased workloads.  (JA1356.)  CLIN 0009 was a cost-plus-fixed-fee CLIN.  (JA1357, JA1360.)

The Contract also contained Clause H.19, which was intended to address workload changes and protect the contractor, as well as DRMS.  (JA510-JA512.)  Clause H.19 was tied to the T&M CLIN (CLIN 0008), under which additional personnel could be added if workloads increased.  (JA1376-JA1377.)  DRMS had never used Clause H.19 prior to the award of the Contract and has not used it since.  (JA513.)

All of the work required by the Contract was ordered through a series of delivery orders issued under each of CLINs 0001-0006.  (JA537-JA538, JA1356,

JA1642, JA1646, JA1653, JA1656, JA1660, JA1664.)  DRMS issued Delivery Order 0001 to order work at Arifjan.  (JA1638-1639.)

Delivery Order 0001 was amended to establish a "workload baseline." (JA1638-JA1642.)  That "workload baseline" was fixed at the level reflected by the August 4, 2007 Historical Data, and did not reflect the actual, increasing workloads recorded by DRMS prior to award.  (JA1638-JA1642.)  Delivery Orders 0002-0006 were issued to order services for the remaining Contract DRMOs, and each likewise incorporated the workload baseline reflected on the August 4, 2007 Historical Data.  (See JA1644, JA1651, JA1655, JA1658, JA1662.)

Measured in line items, the monthly and annualized workload baselines, incorporated into the delivery orders, were as follows:

Table 2

| DRMO | Monthly Baseline | Annualized Baseline[4] |
|------|------------------|------------------------|
| Speicher | 1,064 | 12,786 |
| Victory Base | 1,166 | 13,992 |
| Al Asad | 1,218 | 14,616 |
| Anaconda | 1,662 | 19,994 |
| Arifjan | 9,130 | 109,560 |

---

[4] (See JA3266, JA8.)

| Bagram | 540 | 6,480 |
|---|---|---|

(JA1642, JA1646, JA1653, JA1656, JA1660, JA1664, JA3266, JA8.)

## V.   __PHASE-IN AND CONTRACT PERFORMANCE.__

On January 23, 2008, Agility began its phase-in activities at DRMO Arifjan. (JA83.)  Agility inherited a backlog of approximately 70,000 line items at DRMO Arifjan.  (JA253, JA356, JA9.)  From the very beginning of performance at Arifjan, Agility experienced incoming workloads substantially in excess of the workload baseline.  (JA257, JA3265-JA3267, JA3303-JA3308, JA1870-JA1871.) Agility did not have the staff necessary to process the incoming workload and inherited backlog.  (JA167-JA169, JA252.)

In approximately May of 2008, Agility began performance at the remaining Contract DRMOs.  (JA1682, JA1683, JA1685, JA1687.)  Agility inherited backlog at each of the remaining Contract DRMOs, but not to the extent of the backlog at Arifjan.  (JA644-JA645.)  From the beginning of performance, the actual workload experienced at each of these remaining Contract DRMOs, with the exception of DRMO Speicher, was much greater than the workload baselines.  (JA257, JA3265-JA3267, JA1870-JA1871.)

During the early months of performance, Lieutenant General Dail, director of DLA, toured the Contract DRMOs.  (JA261, JA84.)  On June 8, 2008, General Dail conducted a meeting with DRMS personnel and Agility's senior staff to address performance issues.  (JA84, JA260-JA261.)  General Dail informed Agility that he intended to terminate the Contract if the performance issues were not cured.  (JA261.)

Following the meeting with General Dail, Agility prepared and submitted a Corrective Action Plan.  (JA261-JA262, JA1695.)  As part of the Corrective Action Plan, Agility proposed to increase its staff by 105 individuals, including 66 at Arifjan.  (See JA262-JA265, JA1696-JA1698.)  Agility ultimately hired the specified personnel and employed them in the performance of the Contract.  (JA265-JA266.)  Agility also sent approximately 15 additional employees from its headquarters to assist in performance of the Contract requirements.  (JA267.)

The initial workloads experienced by Agility proved to be much more reflective of the actual requirements than were the workload baselines.  With the exception of DRMO Speicher, and a few months at two of the other Iraqi DRMOs, the actual workloads at each of the remaining Contract DRMOs remained substantially in excess of the workload baselines throughout the period of performance.  (JA3266, JA3303-JA3308, JA2319, JA2341, JA2365, JA2388,

JA2411, JA2434.)  For the first year (April 2008 through March 2009), the actual

workloads at the Contract DRMOs, measured in line items, were as follows:

Table 3

| Area of Operation | Annualized Baseline[5] | Actual Workload | % of Baseline |
|---|---|---|---|
| Speicher | 12,768 | 9,561 | 74.9% |
| Victory Base | 13,992 | 21,899 | 156.5% |
| Al Asad | 14,616 | 24,392 | 166.9% |
| Anaconda | 19,994 | 71,653 | 358.4% |
| Arifjan | 109,560 | 242,401 | 221.3% |
| Bagram | 6,480 | 15,364 | 237.1% |

(JA1642, JA1646, JA1653, JA1656, JA1660, JA1664, JA3266, JA1870-JA1871.)

In total, for the period of April 2008 through March 2009, the actual workload at

all Contract DRMOs, measured in line items, was 217.2% of the annualized

workload baseline.[6]

---

[5] These baselines were set out in Agility's Pre-March 2009 Claim.  (JA3266.)

[6] 385,270 (actual workload total) / 177,410 (annualized baseline total) = 2.172 * 100 = 217.2%.

Workload, measured in scrap weight, also soared.  As compared to the projections in the Scrap Estimate, actual workloads, measured in scrap weight, were as follows:

Table 4

| Period of Performance | Scrap Estimate[7] | Actual Receipts | Percentage of Estimate |
|---|---|---|---|
| April of 2008 – March of 2009 | 85,884,744 | 157,766,631[8] | 184%[9] |

For the first year of performance, actual workload, measured in scrap weight was 184% of that projected by the Scrap Estimate.

Due to the magnitude of the actual workloads being experienced by the Contract DRMOs, Agility's initial staff was insufficient to sustain Contract performance.  (JA252, JA309.)  Although it knew that the actual workloads were more than Agility could process with its initial staff, DRMS still "held Agility's feet to the fire with respect to the [APLs]."  (JA625, JA251.)  In several instances,

---

[7] (JA990.)  The Scrap Estimate provided monthly estimated totals of weight, in pounds, for each period of performance.  (JA1003, JA1012.)  To obtain the estimate for each period of performance, Agility multiplied the monthly estimate for all Contract DRMOs by the number of months in each period of performance.

[8] Reflects the sum of scrap processed in the Contract DRMOs throughout this period of performance.  (JA2325, JA2348, JA2371, JA2394, JA2417, JA2440.)

[9] 157,766,631 / 85,884,744 = 1.84 * 100 = 184%.

20

DRMS reduced Agility's invoices for failure to meet performance metrics. (JA624-JA625, JA251-JA252, JA1647, JA1649.)

Agility retained its initial staff, the staff that it added as part of the Corrective Action Plan, and further supplemented its staff to meet the actual workload. (JA1696-JA1698, JA3332.) During the period of April 2008 through March of 2009, Agility's staff was increased above its initial level to include an additional 160 individuals. (See JA3332-JA3368, JA472, JA3371, JA443, JA447.)

Agility made repeated efforts to obtain DRMS's consent to fund additional personnel. (JA259-JA260, JA271, JA399-JA402, JA1916-JA1922, JA4292-JA4295, JA4298, JA4322-JA4323, JA4334, JA4344-JA4345.) DRMS knew that Agility was processing actual workloads in substantial excess of the workload baselines[10] and that it had hired additional personnel to do so. (JA1695-JA1699, JA266-JA271, JA806.) DRMS never objected to the additional personnel. (See JA270.) Yet DRMS refused to fund additional personnel because it believed that the metrics of Clause H.19 had not been met. (JA399-JA402, JA4292, JA4298, JA4322-JA4323.)

---

[10] DAISY information reflecting actual workloads was available to DRMS within 18-24 hours. (JA637, JA9.)

For the period of April of 2008 through March of 2009, the cost associated with the direct labor component of Agility's additional staff, inclusive of fringe and offsite overhead, was $2,204,683.24. (JA4343, JA456.) During that same period, Agility incurred costs associated with its additional subcontractor staff in the amount of $2,263,661.70. (JA4343.) Inclusive of G&A, the total cost incurred by Agility for the necessary additional staff required to perform increased Contract requirements from April of 2008 through March of 2009 was $4,932,118.89. (JA4343.) Agility was never compensated for those additional costs. (JA309.)

In early 2009, DRMS concluded that Clause H.19 as originally drafted was "inefficient" and "very, very hard to use," and undertook to revise its terms. (JA616, JA1950-JA1952.) In March of 2009, Agility and DRMS entered into bilateral Modification P0014 which revised the terms of Clause H.19. (JA84.) Revised Clause H.19 could be triggered when the workload at any of the Contract DRMOs, measured in line items or scrap weight, was more than 25% above the fiscal year 2008 average. (JA1621-JA1622.) Revised Clause H.19 also required Agility to maintain its then-current staffing levels, but did not address the cost of doing so. (JA618, JA1621-JA1622.) Agility maintained its entire pre-Modification P0014 staff, but was never paid for those individuals added to its initial staff. (JA306.)

For the period of April 2009 through June 2010, the actual workloads, measured in line items, compared to the annualized FY 08 average for each of the Contract DRMOs were as follows:

Table 5

| DRMO | Actual Workload | FY 08 Average[11] | % of FY 08 Average | Workload Baseline[12] | % of Baseline |
|---|---|---|---|---|---|
| Speicher | 13,064 | 19,080 | 68.5% | 15,960 | 81.9% |
| Victory Base | 22,732 | 37,470 | 60.7% | 17,490 | 130.0% |
| Al Asad | 41,397 | 36,315 | 114.0% | 18,270 | 226.6% |
| Anaconda | 56,698 | 50,865 | 111.5% | 24,930 | 227.4% |
| Arifjan | 540,638 | 206,620 | 261.7% | 136,950 | 394.8% |
| Bagram | 38,738 | 18,885 | 205.1% | 8,100 | 478.2% |
| All DRMOs | 713,267 | 369,235 | 193.2% | 221,700 | 321.7% |

(JA2319, JA2341, JA2365, JA2388, JA2411, JA2434.)  Actual workload, measured in weight, also increased after the first year of performance.  For the period of April, 2009 - June, 2010, actual workloads were as follows:

---

[11] The Fiscal Year 2008 average, reflected in the Post-March claim (JA2319, JA2341, JA2365, JA2388, JA2411, JA2434) and accepted as undisputed by the contracting officer (JA1824), was multiplied by the fifteen months of April 2009 through June 2010 to calculate the appropriate average over this time period.

[12] The baseline workload was multiplied by the fifteen months of April 2009 through June 2010.

Table 6

| Period of Performance | Scrap Estimate | Actual Receipts | Percentage of Scrap Estimate |
|---|---|---|---|
| April of 2009 – June of 2010 | 102,043,287 | 349,121,727[13] | 342% |

Table 7

| Period of Performance | FY 08 Average | Actual Receipts | Percentage of FY 08 Average |
|---|---|---|---|
| April of 2009 – June of 2010 | 138,442,164[14] | 349,121,727 | 252% |

For the entire period of performance (i.e. from April, 2008 through June, 2010), the actual workloads (measured in line items) compared to the workload baselines incorporated into Delivery Orders 0001-0006 were as follows:

Table 8

| DRMO | Actual Workload[15] | Annualized Baseline[16] | % of Baseline |
|---|---|---|---|

---

[13] Reflects the sum of scrap processed in the Contract DRMOs throughout this period of performance. (JA2322-JA2324, JA2345-JA2347, JA2368-JA2370, JA2391-JA2393, JA2414-JA2416, JA2437-JA2439.)

[14] Reflects sum of the FY 08 Average for each of the Contract DRMOs multiplied by twelve. (JA2394.)

[15] The actual workload was determined by adding the actual workload from the Pre-March claim (JA3266), which was accepted as undisputed by the contracting

24

| | | | |
|---|---|---|---|
| Speicher | 22,625 | 28,728 | 78.8% |
| Victory Base | 44,631 | 31,482 | 141.8% |
| Al Asad | 65,789 | 32,886 | 200.1% |
| Anaconda | 76,692 | 44,874 | 170.9% |
| Arifjan | 783,039 | 246,510 | 317.6% |
| Bagram | 54,102 | 14,580 | 371.1% |

(JA3303-JA3314, JA2319, JA2341, JA2365, JA2388, JA2411, JA2434.)  In total, for the period of April 2008 through June of 2010, the actual workload (measured in line items) at all Contract DRMOs was 262.3% of the annualized workload baseline.[17]  Measured in scrap weight, the actual workloads, across all Contract DRMOs, was 270% of the Scrap Estimate.[18]

On June 30, 2010, the Contract was terminated for the convenience of the Government.  (JA84.)  Calculated at the time and materials rate set forth in the

---

officer (JA1870-JA1871), to the sum of the actual monthly workloads from the Post-March claim (JA3303-JA3314, JA2319, JA2341, JA2365, JA2388, JA2411, JA2434).

[16] The monthly baseline was multiplied by the twenty-seven months of contract performance to arrive at the appropriate "baseline."

[17] 1,046,878 (column 2 total) / 399,060 (column 3 total) = 2.62 * 100 = 262.3%.

[18] Sum of actual receipts from Table 4 and Table 6 divided by the Scrap Estimate for the entire period of performance.  (157,766,631 + 349,121,727) / (85,884,744 + 102,043,287) = 2.70 * 100 = 270%

Contract (JA471), the value of the additional staff added by Agility prior to the revision to Clause H.19, and maintained through the period of performance was as follows: Direct labor - $1,239,297.42; Subcontract labor - $361,455.53. (JA4342.) Agility also provided materials used in connection with the increased workloads at a cost of $373,467.36 (inclusive of G&A). (JA4342.) Thus, the total value of the additional labor and materials provided by Agility from April 2009 through the end of Contract performance was $1,974,220.31. (JA4342, JA470.) Agility could not have performed the Contract without the additional personnel for which it has never been paid. (JA259, JA309.)

## SUMMARY OF ARGUMENT

Because it anticipated workloads exceeding the capabilities of its staff, DRMS sought to engage a contractor to perform services previously provided only by DRMS. To that end, DRMS solicited proposals for a requirements contract for the operation of the Contract DRMOs. Despite knowing that the staffing of a DRMO was a "trial and error" proposition, DRMS expected offerors to be perfect, and required a fixed price proposal.

DRMS informed offerors of the historical workload processed at each of the Contract DRMOs, the staff "required" to process that workload, and the metrics by which the contractor's performance was to be judged. DRMS also provided

offerors with the Scrap Estimate, which projected workload measured by scrap weight at each of the Contract DRMOs. DRMS provided the foregoing information, without disclaimer, with the intention and expectation that offerors would rely thereon in preparing their proposals. The level of effort reflected by the information actually provided by DRMS was substantially lower than that which DRMS expected to confront the successful awardee. Stated differently, DRMS caused offerors to bid to a set of requirements different than what it expected the awardee to perform.

DRMS never informed offerors of the anticipated workloads that caused it to seek a contractor to provide a more efficient solution for the operation of the Contract DRMOs. Yet DRMS used those anticipated workloads to evaluate proposals. Similarly, DRMS never informed offerors that it viewed its "required" staff as inadequate to meet the workload that it expected to flow through the Contract DRMOs. DRMS twice determined Agility's staff to be inadequate, but never shared that fact with Agility.

Agility based its proposal on the information that DRMS provided, without benefit of the undisclosed, material information that DRMS possessed and used to evaluate proposals. Agility inherited backlog in excess of seven times the workload baseline on which Delivery Order 0001, was based. Agility discovered

27

backlog at each of the other Contract DRMOs, albeit not to the same extent as it discovered at DRMO Arifjan. In addition to the inherited backlog, each Contract DRMO (excluding DRMO Speicher) experienced workloads substantially in excess of the workload baseline, beginning on the first day of performance.

Agility was forced to add to its initial staff in order to process the increased workload. DRMS refused to compensate Agility for those additional personnel added to address the mountain of inherited backlog and swelling turn-ins during the first year of performance. And Agility was forced to retain those personnel, with no additional compensation, throughout the period of performance. For the base year of the Contract, across all of the Contract DRMOs, Agility processed a workload that was 217% of the annualized workload baselines measured in line items, and 184% of the estimated workloads in the Scrap Estimate. For the entire period of performance, the actual workload across all Contract DRMOs was 262.3% of the workload baseline, measured in line items, and 270% of the estimated workloads in the Scrap Estimate.

The trial court rejected both of Agility's Pre- and Post- March 2009 Claims. The purported lack of an estimate by DRMS was the foundation of the trial court's holding on each of Agility's theories. Thus, according to the trial court, because DRMS never provided an estimate of quantities / workload: (a) it was not liable

for failing to disclose its superior knowledge about quantities / workload; (b) it could not have been negligent in preparing an estimate that it never provided; and (c) it could not have breached the warranty of reasonable accuracy with regard to that (non-existent) estimate.  But, as the trial court found in its finding of facts, DRMS <u>did</u> provide estimates of quantities / workload.  The trial court's legal analysis betrayed its own findings of fact.

In addition to the inherent flaw mentioned above, the trial court misconstrued Agility's argument that DRMS constructively changed the Contract when it failed to disclose its superior knowledge.  As a result, the trial court never addressed the actual basis of Agility's argument, which was that DRMS allowed offerors to bid to requirements that DRMS knew to be lower than it expected the awardee to encounter.  The trial court also held that the government may avoid liability under the superior knowledge doctrine simply by providing offerors with historical requirements.  Such a holding would allow the government to knowingly misstate anticipated requirements, so long as it provided historical data.  The rule of law adopted by the trial court is contrary to this Court's controlling precedent.

The trial court's holding with regard to Agility's negligent estimate theory was similarly flawed.  The trial court held that DRMS never provided offerors with an estimate as required by 48 C.F.R. § 16.503.  The absence of an estimate,

according to the trial court, insulated DRMS from liability. But that holding was contrary to the trial court's own findings: (a) that the Contract was a requirements contract, and DRMS had provided historical requirements to offerors to use in preparing their proposals; and (b) that DRMS provided the Scrap Estimate, which was undoubtedly an estimate provided to and relied upon by offerors.

The trial court's rejection of Agility's argument that DRMS breached the Warranty of Reasonable Accuracy was wrong for the same reason. The sole basis of the trial court's decision was its conclusion that DRMS had not provided an estimate or made a representation to offerors. That holding again completely ignored the trial court's earlier finding that DRMS had provided the Scrap Estimate, which was an estimate given for the express purpose of assisting offerors in preparing their proposals.

For the above reasons, more fully discussed below, the trial court's judgment should be reversed.

## ARGUMENT

## I.    STATEMENT OF THE STANDARD OF REVIEW.

In reviewing judgments of the trial court, this Court reviews conclusions of law, including conclusions relating to the interpretation of contracts, without

deference.  See Mass. Bay Transp. Auth. v. United States, 254 F.3d 1367, 1372

(Fed. Cir. 2001).  In other words, conclusions of law are subject to a *de novo*

standard.  Findings of fact are reviewed under the "clearly erroneous" standard.

Id.; City of El Centro v. United States, 922 F.2d 816, 819 (Fed. Cir. 1990).


## II.    **INTRODUCTION.**

The purpose of an equitable adjustment is to do equity.  See Raytheon Co. v.

United States, 747 F.3d 1341, 1353 (Fed. Cir. 2014).  The equities of this case

strongly favor Agility.  As shown below, the trial court erred in denying Agility's

claims for an equitable adjustment and entering judgment in favor of DRMS.  First,

Agility will demonstrate how the trial court erred in holding that DRMS did not

constructively change the Contract.  Next, Agility will describe how the trial

court's holding with regard to Agility's negligent estimate theory is in error

because it is at odds with the undisputed facts - - as found by the trial court - - and

existing law.  Lastly, Agility will explain that the trial court erred by summarily

rejecting Agility's claim that DRMS breached the warranty of reasonable

accuracy.[19]  For the reasons shown more particularly below, the trial court's

judgment against Agility should be reversed.

---

[19] As the trial court noted, Agility's Pre-March 2009 Claim and its Post-March
2009 Claim were based on the same theories of law.  The trial court did not address
Agility's Post-March 2009 Claim with specificity because it found against

## III.   THE TRIAL COURT ERRED IN HOLDING THAT DRMS DID NOT CONSTRUCTIVELY CHANGE THE CONTRACT BY WITHHOLDING ITS SUPERIOR KNOWLEDGE REGARDING ANTICIPATED QUANTITIES / WORKLOAD.

A constructive change occurs when a contractor performs work exceeding contractual requirements, without a formal change order, either because of an informal government order or through the fault of the government. LB&B Assocs. Inc. v. United States, 91 Fed. Cl. 142, 153 (2010); Int'l Data Prod. Corp. v. United States, 492 F.3d 1317, 1325 (Fed. Cir. 2007). The change component of a constructive change requires proof of work not required by the contract. Delhur Indus., Inc. v. United States, 95 Fed. Cl. 446, 461 (2010). The order / fault element requires proof that the additional work was caused by the government. Miller Elevator Co. v. United States, 30 Fed. Cl. 662, 678 (1994).

Under the "order" theory of causation, a contractor must demonstrate some degree of force or coercion by the government, causing the contractor to perform the additional work. Ralph Nash, Jr. & Steven W. Feldman, Government Contract Changes, Third Edition, § 10.2 (Thompson West 2007). Alternatively, under the

---

Agility's theories as part of its analysis of Agility's Pre-March 2009 Claim. The same errors permeated the trial court's analysis of both of Agility's Claims. To avoid repetition, Agility's brief tracks the trial court's Opinion and Order, and is organized by addressing the trial court's errors in analyzing each of Agility's theories, as opposed to each of its Claims. To be clear, however, Agility ascribes the same errors to the trial court's analysis for its Pre-March 2009 Claim and Post-March 2009 Claim.

32

"fault" theory, the contractor must demonstrate a deficiency in the contract, such as a defective specification or non-disclosure, or some misconduct by the government in the administration of the contract. Miller Elevator Co., 30 Fed. Cl. at 678. Furthermore, the government has a duty to disclose vital, superior knowledge bearing on the cost or duration of performance. Giesler v. United States, 232 F.3d 864, 876 (Fed. Cir. 2000); Petrochem Servs., Inc. v. United States, 837 F.2d 1076, 1078-80 (Fed. Cir. 1988). Failure to make the required disclosure constitutes a constructive change to the contract. See Petrochem Servs., Inc., 837 F.2d at 1079; Max Jordan Bauunternehmung v. United States, 10 Cl. Ct. 672, 678 (1986), aff'd, 820 F.2d 1208 (Fed. Cir. 1987); Miller Elevator Co., 30 Fed. Cl. at 678.

In this case, Agility sought an equitable adjustment due to DRMS's failure to disclose its vital, superior knowledge. The trial court erred when it determined that the Contract was not constructively changed by DRMS's failure to make the required disclosures.

## A. The Trial Court Misconstrued Agility's Constructive Change Theory.

The trial court's analysis of Agility's constructive change theory was wrong-footed from the outset. The trial court misconstrued Agility's constructive change theory as being rooted in "DRMS's non-disclosure of its superior knowledge about scrap estimates and troop movements." (JA13.) The trial court then proceeded to

determine whether DRMS should have provided "scrap estimates" and "estimates of troop movements." (JA13, JA14.)  Following this ancillary path, the trial court held that DRMS's non-disclosure of "scrap estimates" was justified because they "would likely be inaccurate, and potentially more misleading than historical workload data." (JA14.)  The trial court also found that estimates of future troop movements would have been unhelpful to Agility, and held that DRMS had not constructively changed the Contract "by failing to provide estimates of future troop movements." (JA14.)  The trial court's holding was contrary to its findings of fact, and never reached the nub of the disagreement between DRMS and Agility.

## 1. DRMS <u>did</u> provide a scrap estimate, and it was just as "misleading" as the trial court predicted.

The absence of a scrap estimate was never an issue in this case, *because one was provided to offerors*.  The trial court specifically found that DRMS provided offerors with the Scrap Estimate, which projected workload, measured by scrap weight, at each of the Contract DRMOs. (JA3, JA6.)  The Scrap Estimate projected a decline in workload over the period of performance. (JA990-JA991, JA1003, JA1012.)  That projection was contrary to DRMS's knowledge that increased workloads resulting from expected troop drawdowns would overwhelm DRMS's staff at the Contract DRMOs. (JA1304.)

Agility certainly agrees with the trial court's conclusion that the Scrap Estimate was "misleading." Without the benefit of DRMS's superior knowledge, the Scrap Estimate and other information provided to offerors portrayed requirements - - to which offerors were bidding, on a fixed-price basis - - to be substantially lower than DRMS expected them to be. Had Agility known that the workloads were expected to be more than even DRMS's "required" staff could handle, it would have submitted a substantially higher fixed-price proposal.

The trial court's rejection of Agility's constructive change theory ignored the Scrap Estimate provided by DRMS. Thus, the underpinning of the trial court's decision was misplaced. Had the trial court applied the law to the facts as it found them to be (i.e., had it considered the "misleading" Scrap Estimate), it would have been compelled to enter judgment in favor of Agility. But by applying the law to facts different from those that it previously found, the trial court erred and is due to be reversed.[20]

_____

[20] Agility does not challenge the trial court's finding that DRMS provided the Scrap Estimate, but only its election to ignore that fact when analyzing each of Agility's theories. Thus, Agility submits that the Court is not bound by the clearly erroneous standard when reviewing the trial court's holding. But given that the trial court found the Scrap Estimate to exist, the trial court's decision to ignore that fact would meet the clearly erroneous standard.

**2.      DRMS knew and was required to disclose *the effect* of anticipated troop movements.**

Agility never complained about the lack of "estimates of future troop movements." Instead, Agility established that DRMS knew that anticipated troop movements would cause workloads to exceed the capacity of DRMS's staff. (JA1304.) The undisputed evidence showed that such knowledge was the very reason for the award of the Contract, and was certainly possessed by DRMS during proposal activities (i.e., in time to alert offerors to this vital information). (JA501-JA502.) The trial court made the same findings. (JA4.) Based on those findings, the trial court should have found entitlement on Agility's constructive change theory. Instead, the trial court segregated elements of DRMS's superior knowledge, and explained why certain portions of that knowledge, standing alone, would not have been helpful to offerors.

In isolation, knowledge of specific troop movements might not have been helpful to offerors because, unlike DRMS, they had never staffed a DRMO. There can be no doubt, however, that the knowledge of expected troop movements had a monumental effect on DRMS, because it was uniquely situated to understand the impact those movements would have on the operation of the Contract DRMOs. Without that knowledge, which was the singular motivating factor in DRMS's decision to outsource the operation of the Contract DRMOs, the information

36

provided to offerors was misleading and caused offerors to bid to requirements far

below those anticipated by DRMS.  By failing to make the required disclosure and

misleading offerors, DRMS constructively changed the Contract.  The trial court's

contrary holding was in error.  Miller Elevator Co., 30 Fed. Cl. at 678.

### B.    The Trial Court Erred in Applying Negligent Estimate Principles to Agility's Constructive Change Theory.

The negligent estimate doctrine parallels the doctrine of superior knowledge.

Both concepts are designed to ensure that offerors are provided a reasonable

opportunity to respond to a government's invitation to bid.  See Giesler, 232 F.3d

at 876; Hi-Shear Tech. Corp. v. United States, 53 Fed. Cl. 420, 431-32 (2002);

Chem. Tech., Inc. v. United States, 227 Ct. Cl. 120, 141-142 (1981); Womack v.

United States, 182 Ct. Cl. 399, 413 (1968).  Despite their unity of purpose,

however, the doctrines are not coextensive.  This Court has recognized that the

government has a duty to disclose its superior knowledge where:

> (1) a contractor undertakes to perform without vital knowledge of a
> fact that affects performance costs or duration; (2) the government
> was aware the contractor had no knowledge of and had no reason to
> obtain such information (3) any contract specification supplied misled
> the contractor or did not put it on notice to inquire; and (4) the
> government failed to provide the relevant information.

Giesler, 232 F.3d at 876 (citing Hercules, Inc. v. United States, 24 F.3d 188, 196

(Fed. Cir. 1994)); Petrochem Servs., Inc., 837 F.2d at 1078-79(quoting Am. Ship

Bld. Co. v. United States, 228 Ct. Cl. 220, 225 (1981)).  Where the first three

elements are present, the government is required to disclose its superior

knowledge.  Northrup Grumman Corp., Military Aircraft Div. v. United States, 63

Fed. Cl. 12, 16 (2004).  The last element determines whether the government has

satisfied that obligation.  Id.

The negligent estimate doctrine incorporates a reasonableness standard, and

focuses on the government's efforts to estimate contract requirements.  Hi-Shear,

53 Fed. Cl. at 431-32; Crown Laundry and Dry Cleaners, Inc. v. United States, 29

Fed. Cl. 506, 520–521 (1993).  Conversely, the doctrine of superior knowledge is

not limited to government estimates, but applies to undisclosed "vital knowledge

of a fact that affects performance costs or duration."  Giesler, 232 F.3d at 876.

Thus, while the negligent estimate doctrine focuses on the reasonableness of the

information *actually provided*, the superior knowledge doctrine has a reciprocal

focus on the importance and availability of information *not provided*.  See Crown

Laundry, 29 Fed. Cl. at 520–521, Giesler, 232 F.3d at 876.

In rejecting Agility's constructive change theory, the trial court applied the

Court's holding in Medart, Inc., 967 F.2d at 582.  (JA14.)  Relying on Medart, Inc.,

the trial court held that because DRMS provided historical requirements, it had no

liability for failing to disclose its superior knowledge.  (JA14.)  Such a holding was

error.  Medart, Inc. dealt with a negligent estimate, not the duty to disclose superior

knowledge.  Medart, Inc. was thus inapplicable to Agility's constructive change

theory.

The government is permitted to obtain its estimate from records of previous

requirements.  48 C.F.R. § 16.503(a)(1)  As described below, however, even in the

negligent estimate context, the government cannot provide an estimate that it

knows or should know to misstate expected requirements.  See Rumsfeld v.

Applied Cos., Inc., 325 F.3d 1328, 1335 (Fed. Cir. 2003); Crown Laundry & Dry

Cleaners, Inc., 29 Fed. Cl. at 522-23.  The government is not free to withhold its

superior knowledge and knowingly cause offerors to bid to an inaccurate estimate,

even if the estimate was based on historical requirements.  See Giesler 232 F.3d at

876; Miller Elevator Co., 30 Fed. Cl. at 674-75.  Yet the trial court's holding

completely vitiated the superior knowledge doctrine by creating an exception to its

application where the government provides historical data, without regard to any

potential misleading effect that the data could have on offerors.  Medart, Inc. does

not stand for that proposition.  In considering a claim under the superior

knowledge doctrine, the Court should not focus on the reasonableness of

information actually provided, as the trial court did.  Instead, it should evaluate

whether, without the government's undisclosed knowledge, the information

actually provided was misleading to the contractor.  See, e.g., Giesler, 232 F.3d at

876.  The trial court erred by considering Agility's superior knowledge theory

through the prism of negligent estimate principles articulated in <u>Medart, Inc.</u>

### C.    <u>Analyzed Correctly, Agility is Entitled to an Equitable Adjustment on its Constructive Change Theory</u>.

Prior to entering into the Contract, DRMS operated all DRMOs in the world.

(JA81-JA82, JA1303, JA625.)  Based upon its unique experience, DRMS knew

that the best method for staffing a DRMO was "trial and error."  (JA571.)

However, the Solicitation did not contemplate a "trial and error" process; instead,

offerors were required to submit fixed-price proposals, meaning that they had

exactly one chance to divine the perfect staffing solution.  Thus, good faith and fair

dealing required DRMS to disclose to offerors all vital information affecting their

staffing proposals.  <u>See</u> <u>Miller Elevator Co.</u>, 30 Fed. Cl. at 674 (citing John

Cibinic, Jr. & Ralph C. Nash, Jr., <u>Admin. of Gov't Contracts</u>, 192 (2d. ed. 1986)).

Instead of complaining about the lack of scrap estimates - - which were

unquestionably provided - - and estimates of troop movements, Agility's

constructive change theory was focused upon the contrast between the information

that DRMS actually provided to offerors, and that vital information which it

withheld.  DRMS provided offerors with historical workload data.  (JA506-JA507,

JA1667-JA1674, JA128.)  But the historical workloads did not reflect the actual

requirements that DRMS expected offerors to meet.  DRMS never made that fact

known to offerors.  Similarly, DRMS provided offerors with its own staffing profile, showing those personnel "required" and "on-board" at each Contract DRMO.  (See JA1642, JA1646, JA1653, JA1656, JA1660, JA1664.)  But DRMS never informed offerors that its "required" personnel would be inadequate to address the anticipated workloads.  (See, e.g., JA1667-JA1674, JA136.)

In February of 2007, DRMS told offerors that it had no estimates.  (JA782, JA810.)  In June of 2007, DRMS told DRMS told offerors that it expected the workload to "increase."  (JA811, JA945.)  However, on July 24, 2007, DRMS reversed course and provided an estimate of workload:  the Scrap Estimate, upon which it intended offerors to rely.  (JA990-JA991, JA1003.)  The Scrap Estimate projected constant and then declining workloads.  (JA990-JA991.)

DRMS's selective disclosure was misleading to offerors.  Agility relied on the information provided by DRMS to build its staffing profile.  (JA134, JA178-JA180, JA191, JA1063, JA3268.)  The information provided by DRMS reflected a constant workload during the first year at five of the six Contract DRMOs.  (JA990-JA991.)  Agility submitted its fixed-price proposal based on that express assumption, which was formed without the benefit of DRMS's superior knowledge that projected troop movements would overwhelm DRMS "required" staff.  (JA136, JA143-JA144, JA1063.)  And not only did DRMS withhold its superior

41

knowledge from offerors during initial proposal activities, but it used that undisclosed superior knowledge to evaluate their proposals.

Burns, DRMS's lead COR, and a member of the source selection evaluation team for the Contract, evaluated Agility's proposal. (JA1042.) Burns informed DRMS that Agility would be understaffed, particularly at DRMO Arifjan. (JA578, JA646.) DRMS instructed Burns not to communicate "that concern" to Agility. (JA646-JA647.) Similarly, DRMS's technical evaluators determined that, "[b]ased on current and projected workload," Agility would be understaffed at DRMO Arifjan, and reported the same to DRMS. (JA1179.) Although twice identified by evaluators, DRMS never informed Agility of its potential staffing problems. (JA136.)

From its review of Agility's proposal, DRMS knew that Agility's staff was designed to accommodate a relatively constant workload. (JA1173-JA1176.) DRMS also expected Agility to face much greater workloads, which even its own, substantially larger staff, would be unable to handle.[21] (JA1303-JA1304.) Instead of disclosing that superior knowledge, which Agility could not obtain elsewhere, DRMS remained silent and allowed Agility to enter into the Contract with an insufficient staff. By doing so, DRMS constructively changed the Contract, and

---

[21] In fact, prior to award, the actual workloads had already begun to rise. (JA686.)

Agility is entitled to an equitable adjustment.  Miller Elevator Co., 30 Fed. Cl. at

678.  The trial court's contrary holding was in error.

## IV.   THE TRIAL COURT'S HOLDING ON AGILITY'S NEGLIGENT ESTIMATE THEORY WAS CONTRARY TO FACT AND LAW.

The trial court rejected Agility's negligent estimate theory.  (JA17)  The trial

court's decision turned on two holdings which were contrary to fact and law.  First,

the trial court found that DRMS never provided offerors with a realistic estimate of

quantities / workload, which the trial court determined to be a complete defense to

liability under a negligent estimate theory.  (JA16.)  Secondly, the trial court held

that DRMS's decision to provide historical workloads, and indicate that it expected

workloads to "increase," satisfied its obligations to offerors.  (JA16.)  Both

holdings were in error.

### A.   DRMS was Required to Provide A "Realistic" Estimate of Quantities / Workload.

#### 1.   The Contract was a requirements contract.

Indefinite delivery contracts, such as the Contract, must be one of three

possible types:  definite quantity, indefinite quantity and requirements.  Mason v.

United States, 222 Ct. Cl. 436, 444 (1980); Ace-Fed. Reporters, Inc. v. Barram,

226 F.3d 1329, 1331 (Fed. Cir. 2000).  The parties' respective rights and

obligations differ depending upon the nature of the contract at issue.  The trial

court undertook to determine the nature of the Contract, so as to define those rights and obligations.  (JA11.)

The construction and interpretation of a contract is a matter of law for the court.  <u>Allied Tech. Grp., Inc. v. United States</u>, 94 Fed. Cl. 16, 39 (2010); <u>Novamedix, Ltd. v. NDM Acquisition Corp.</u>, 166 F.3d 1177, 1180 (Fed. Cir. 1999).  In construing a contract, the court is not bound by labels or the parties' description of its terms.  <u>A-Transport Northwest Co., Inc. v. United States</u>, 27 Fed. Cl. 206, 214 (1992); <u>Ace-Fed. Reporters, Inc.</u>, 226 F.3d at 1331.  Instead, the court must determine the nature of a contract by focusing on the parties' intent, as reflected by the contract's plain language and, where appropriate, extrinsic evidence.  <u>D'Andrea Bros. LLC v. United States</u>, 96 Fed. Cl. 205, 218-219 (2010).

DRMS contemplated that CLINs 0001-0007 (<u>i.e.</u>, those fixed-price CLINs tied to operation of the Contract DRMOs) would be "definite quantity" CLINs.  (JA1036.)  DRMS incorporated FAR 52.216-20 "Definite Quantity" into the Solicitation.  (JA841-JA842.)  A definite quantity contract requires a designation of the quantity of goods or services to be provided by the contractor.  48 C.F.R. § 52.216-20.  Despite its labels, the only quantities in the Solicitation were the months of performance; there was no true measure of workload.  (<u>See</u> JA817.)

Thus, the Solicitation did not satisfy FAR 52.216-20, and was not a definite quantity contract.

Where a contract is susceptible to construction as a requirements contract, a court should so construe it. Crown Laundry, 29 Fed. Cl. at 516. The *sine qua non* of a requirements contract is the purchaser's agreement to use the seller as its exclusive supplier for all necessary goods or services. Modern Sys. Tech. Corp. v. United States, 979 F.2d 200, 205 (Fed. Cir. 1992); Mason v. United States, 222 Ct. Cl. at 442, (quoting Media Press, Inc. v. United States, 215 Ct. Cl. 985, 986 (1977)). Here, DRMS made clear its intention to make a single award, and have the single awardee fulfill all requirements. (JA692.) DRMS expected the single awardee to perform "all tasks DRMS performs in support of the Department of Defense mission." (JA752.) Based on these factors, the trial court correctly determined that the Contract was a requirements contract. (JA11.)

> **2.    Because the Contract was a requirements contract, DRMS
> had to comply with 48 C.F.R. § 16.503(a)(1).**

When awarding a requirements contract, the government must include in the solicitation an estimate of quantities / workload. According to FAR 16.503(a)(1):

> For the information of offerors and contractors, the contracting officer
> shall state a ***realistic*** estimated total quantity in the solicitation and
> resulting contract. This estimate is not a representation to an offeror or
> contractor that the estimated quantity will be required or ordered, or

45

that conditions affecting requirements will be stable or normal. The contracting officer may obtain the estimate from records of previous requirements and consumption, or by other means, and should base the estimate on the most current information available.

48 C.F.R. § 16.503(a)(1)(emphasis added).  The foregoing concept is one with

which this Court is well acquainted.  On several occasions, this Court has

recognized the government's <u>obligation</u> to provide offerors with a "realistic"

estimate as part of the solicitation for a requirements contract.  In <u>Rumsfeld</u>, the

Court explained its rationale:

> While the quantity of items that the government will purchase under a requirements contract necessarily is uncertain, it is not irrelevant, as the quantity may impact both a contractor's capacity to supply the contract items and the price at which it agrees to supply them.  For that reason, as part of the solicitation for a requirements contract, the government prepares estimates of the quantity of goods it will require during the term of the contract. These estimates, though 'not guarantees or warranties of quantity, constitute one of the only limitations on the government's otherwise almost unbridled flexibility with respect to the number of units it purchases.  Therefore, there is an implied obligation upon the government to act in good faith and use reasonable care in computing its estimated needs.

325 F.3d at 1334-35 (internal citations and quotations omitted); see also Medart,

Inc., 967 F.2d at 581 (providing that "under the Federal Acquisition Regulation the

contracting officer **must** furnish estimated quantities in a solicitation

contemplating a requirements contract")(emphasis added).

In certain circumstances, a contracting agency may deviate from the proscriptions of the FAR. 48 C.F.R. § 1.403. Any deviations must be approved by the head of the agency or senior-level designee. Id.; 48 C.F.R. § 201.403. The contracting officer must document the justification and agency approval for the deviation in the contract file. 48 C.F.R. § 1.403. Absent such approvals, an individual deviation is considered beyond the contracting officer's authority, and thus invalid. See, e.g., Bay Cnty., Fla. v. United States, 112 Fed. Cl. 195, 203 (2013). DRMS never obtained a deviation from FAR 16.503. Therefore, as a matter of law, DRMS was obligated to provide offerors with a non-negligent, realistic estimate of the quantities / workload that it expected at each of the Contract DRMOs.

### B.    DRMS *Did Provide* Estimates of Quantities / Workload.

Given the determination that the Contract was one for requirements, the trial court's conclusion that DRMS did not provide an estimate would seem problematic for DRMS. However, the trial court held that DRMS's failure to follow applicable regulation was a complete defense to liability under the negligent estimate theory. (JA17.) As shown below, the trial court's analysis was contrary to law, and its own findings of fact.

### 1.    The historical workloads were part of the estimate.

In rejecting Agility's negligent estimate theory, the trial court drew a significant distinction between an "estimate" and the "historical workload data." (JA15-JA17.)  The trial court then concluded that DRMS provided no estimates. (JA13, JA14.)  While FAR 16.503 allows the government to base its estimate on historical requirements, there is no authority allowing the government to satisfy its obligations by providing no estimate at all.  Yet that is the clear import of the trial court's holding.

The undisputed evidence showed that DRMS provided the historical workload data with the express expectation and intent that offerors would use it to prepare their proposals.  (JA507-JA508, JA522-JA523.)  The undisputed evidence also showed that Agility did, in fact, rely on the historical workload data provided by DRMS to prepare its proposal.  (JA133-JA134, JA191.)  Thus, in the context of this requirements contract, the historical workload data should be considered part of the estimate provided to offerors by DRMS, and analyzed accordingly.  See, generally, Serv. Technicians, Inc. v. United States, 37 Fed. Cl. 383, 387 (1997) (raw historical data provided to offerors to prepare responses to solicitation could be construed as an estimate); Medart, Inc., 967 F.2d at 580 (unadjusted historical requirements served as the government's estimate).  The trial court's holding to the

48

contrary improperly imposed upon Agility all of the risks and burdens of a requirements contract while, at the same time, relieving the government of the concomitant burdens imposed by law.  As such, the trial court erred.

### 2.    Regardless of the historical workload data, DRMS provided an estimate of quantities / workload measured by weight.

Workload under the Contract could be measured by line item or by weight. (See, e.g., JA1621, JA1740.)  The Scrap Estimate was an estimate of workload, measured by weight, for the full term of the Contract (assuming all options were exercised).  (JA990-JA991, JA528-JA529.)  DRMS provided the Scrap Estimate for offerors to use in preparing their proposals.  (JA528-JA529, JA1003.)  Agility relied on the weight-based workload estimate in preparing its proposal.  (JA142-JA143, JA191, JA1063, JA3268.)  *Thus, regardless of the characterization of the historical workload data, DRMS did provide estimated workloads measured in scrap weight.*

### C.    The Estimates Provided by DRMS Were Negligently Prepared.

### 1.    Providing only historical requirements is not reasonable *per se*.

In Medart, Inc., the Court expounded upon the government's obligations in preparing estimates for a requirements contract.  The Court reiterated that, in preparing estimates, "the government must act in good faith and use reasonable

care in computing its estimated needs; it is not free to carelessly guess at its needs." Medart, Inc., 967 F.2d at 581.  The Court, citing Womack, 389 F.2d at 801, held that the government had acted reasonably by relying on the most recent historical requirements, as permitted by regulation, and that it was not required to search for, or create, additional information.  Medart, Inc., 967 F.2d at 582.[22]

After (incorrectly) stating that DRMS had not provided estimated workloads, the trial court expanded the Court's holding in Medart, Inc. to fashion a rule relieving the government of any liability where it provides only historical requirements.[23]  (JA17.)  In essence, the trial court established a safe harbor for the government when providing estimates.  Under the trial court's rule, the government is free to provide an estimate which it knows or should know to be wrong, so long as that estimate is based upon historical requirements.  (JA17.) However, neither Womack, nor Medart, Inc., nor any other opinion of this Court or the United States Court of Federal Claims has ever adopted that view.  The opposite is true; this Court has rejected that very argument.  See Rumsfeld, 325 F.3d 1328.

---

[22] In Medart, Inc., the government did not contend that its historical data was anything other than an estimate.  967 F.2d at 580.

[23] As discussed above, the trial court even applied this misplaced rule to prevent liability under the superior knowledge doctrine.

In Rumsfeld, the government provided estimated quantities to offerors in connection with the competition for a requirements contract. Id. at 1330. Prior to award, the government learned that its prior estimates were incorrect, but did not inform offerors of that error. Id. at 1331. Instead, the government proceeded to award the contract and thereafter notified the awardee of its error. Id. The government argued that, because the requirements contract did not obligate the government to purchase a specified quantity of items, the faulty estimate was "irrelevant," and its failure to correct the estimate was of no consequence. Id. at 1334. This Court, citing Medart, Inc., rejected the government's argument, and affirmed the Armed Services Board of Contract Appeal's decision that the government had breached the contract by failing to correct the estimate. Id. at 1334-1335, 1342.

On at least two prior occasions, the United States Court of Federal Claims has likewise rejected the rule of law seemingly adopted by the trial court. In considering the estimate provided in Datalect Computer Servs., Ltd., the court distinguished the facts of that case from Medart, Inc. because, unlike in Medart, Inc., the government had information available to it that indicated it may have misstated its requirements. Datalect Computer Servs., Ltd. v. United States, 40 Fed. Cl. 28, 37 (1997), aff'd in part, vacated in part, 215 F.3d 1344 (Fed.Cir.1999) (table), cert. denied, 529 U.S. 1037, (2000). The court held that "when such

information exists . . . [Medart, Inc.] actually requires its evaluation or disclosure.
Id.

To a similar effect is Crown Laundry, 29 Fed. Cl. 506.  In Crown Laundry,
the court examined the reasonableness of an estimate provided to offerors bidding
on a requirements contract.  29 Fed. Cl. at 519.  The estimates at issue were
formulated by requesting estimated monthly requirements from using activities,
and projecting them for a twelve-month period.  Id. at 520.  The government made
no effort to verify the accuracy of the estimates against information such as pickup
and delivery tickets which were readily available to the government.  Id. at 521.
Most important, however, was the fact that the COR was aware that the using
activities had likely "exaggerated" their needs, yet the contracting officer did
nothing to investigate those claims.  Id. at 522-23.  Because the government knew
that its estimate - - which was based upon historical requirements - - misstated
contract requirements, the trial court held the government liable to the contractor.
Id. at 523.

In Medart, Inc., the Court refused to expand the government's obligations in
preparing estimates because to do so would be to rewrite FAR 16.503(a)(1).  967
F.2d at 582.  Here, the trial court's rule of law had that very effect.  Instead of
being required to provide a "realistic" estimate of quantities / workload, under the

trial court's rule, the government has no obligation to provide any estimate at all. Instead, the government is free to provide only historical requirements, and turn a blind eye to any other current, relevant information, even if the result is to provide offerors with information that the government knows, or should know, to misstate anticipated requirements. Because this Court has rejected that very result, see Rumsfeld, supra, and the judicial rewriting of FAR 16.503, see Medart, Inc., 967 F.2d at 582, the Court should likewise reject the rule of law adopted by the trial court.

### 2. DRMS knew or should have known that its estimate misstated expected quantities / workload.

At a minimum, regardless of whether the historical workloads are characterized as an estimate or something else, the undisputed facts, as found by the trial court, show that DRMS *did* provide an estimate of workloads measured by weight. The trial court proclaimed that an estimate of that type would be "misleading." (JA14.) Agility was certainly misled by the Scrap Estimate. Alternatively, the Court may choose to consider the estimate that DRMS provided to be comprised of the Scrap Estimate, together with actual historical workloads and staffing information. Under either approach, Agility is entitled to an equitable adjustment.

DRMS knew and expected that offerors would use the historical workloads, staffing information and the Scrap Estimate to prepare their proposals. (JA507-JA508, JA522-JA523, JA1003.) Agility relied on the foregoing information to prepare its proposal. (JA134, JA142, JA147, JA178-JA180, JA191, JA3268.) Agility staffed its workforce to meet a relatively constant workload at each of the Contract DRMOs except Al Asad. (JA1174-JA1176.) The expected constant workload reflected by Agility's proposal was consistent with the Scrap Estimate. (Compare JA1174-JA1176 with JA990-JA991.) DRMS knew otherwise, however.

During proposal activities, DRMS had already determined that anticipated troop movements would cause workloads to increase beyond the capacity of its "required" staff. (JA501-JA502, JA1304.) DRMS never informed offerors that its "required" staff would be inadequate to address upcoming workloads. (JA135-JA136.) Such information would have been material to Agility and would have impacted the preparation of Agility's proposal. (JA136.)

DRMS evaluated Agility's proposal against expected workloads, and twice determined Agility's proposed staff to be inadequate. (JA578, JA646, JA1179.) DRMS never informed Agility of that determination. (JA647, JA136, JA1186, JA1190.) Such information would have been material to Agility and would have impacted the preparation of Agility's proposal. (JA136.)

During the evaluation of proposals, DRMS knew that quantities / workload had begun to tick up at DRMO Arifjan. (JA686.) Indeed, in some months following Agility's submission of its proposal, actual workloads at DRMO Arifjan exceeded the workload baseline by approximately one-third. (JA686.) DRMS never informed Agility of the already-increasing workloads. Indeed, when it issued Delivery Order 001 (as modified) for DRMO Arifjan, it incorporated as the workload baseline the historical workload data from the August 4, 2007 Historical Data, and not the substantially higher workloads that DRMS was then encountering at DRMO Arifjan. (JA1642.) Such information would have been material to Agility and would have impacted Agility's proposal. (JA137-JA139.)

The workloads that Agility faced were not constant or declining, as DRMS projected, but increased substantially, as DRMS knew it would. For the first year of performance, across all Contract DRMOs, Agility processed workloads that were 262.3% of the workload baselines, measured in line items. (See Table 8 above.) For the entire period of performance, the workloads were 217% of the workload baselines. (See Table 3 above.)

The estimated workloads measured by scrap weight were similarly inaccurate. For the first year of performance, actual workloads (measured in scrap weight) were 184% of the Scrap Estimate's projection. (See Table 4.) For the

entire period of performance, actual workloads were 270% of the Scrap Estimate.
(See Table 4 and Table 6.)

In sum, the effect of the Scrap Estimate and historical workload and staffing data that DRMS provided was to estimate a constant or decreasing workload, at least during the first year of performance, at all but one Contract DRMO. DRMS knew or should have known that its estimate misstated expected requirements, and that Agility would be understaffed. DRMS had an obligation to correct its estimate, but chose to remain silent.[24]

Neither the Scrap Estimate nor the historical workload data reflected the increased quantities / workload that DRMS expected. While DRMS was not required to search for or create additional data, the record showed that it had and used information more reflective of expected workloads than the information provided to offerors. Agility relied on the misstated requirements to its detriment

_____

[24] The trial court concluded that DRMS's statement to offerors that it expected an "increase in property turn-ins" barred liability under the negligent estimate theory. (JA14.) DRMS provided that information in response to a question seeking information as to the "magnitude" of expected work flow fluctuations. DRMS's statement was non-responsive, and devoid of any substantive information as to the magnitude of the expected increase, or its timing. Some months after making that statement, DRMS provided the Scrap Estimate, which contained a contrary projection. Under the circumstances, DRMS's generic statement was completely unhelpful, later contradicted, and insufficient to satisfy DRMS's obligations.

and was understaffed.  Thus, Agility is entitled to an equitable adjustment, and the trial court erred by holding otherwise.

## V.    THE TRIAL COURT ERRED IN HOLDING THAT DRMS DID NOT BREACH THE WARRANTY OF REASONABLE ACCURACY.

The government can be held liable for resulting damages when a contractor actually and justifiably relies, to its detriment, upon inaccurate government estimates provided without disclaimer.  See Troise v. United States, 21 Cl. Ct. 48, 65 (1990); Everett Plywood & Door Corp. v. United States, 190 Ct. Cl. 80, 90-92, (1969); Cedar Lumber, Inc. v. United States, 5 Cl. Ct. 539 (1984); John C. Cibinic, Jr., Ralph C. Nash, Jr. & James F. Nagle, Admin. of Gov't Contracts, Fourth Edition, 259-60 (The George Washington University National Law Center 2006). The warranty of reasonable accuracy parallels the concept of negligent estimate, but imposes liability on the government even absent a finding of fault.  John C. Cibinic, Jr., Ralph C. Nash, Jr. & James F. Nagle, Admin. of Gov't Contracts, Fourth Edition, 260 (The George Washington University National Law Center 2006)  Under the negligent estimate theory, the government's actions in preparing estimates are judged against then-existing facts.  Id. at 259.  Conversely, because fault is not at issue, courts do not focus on then-existing facts when analyzing a potential breach of the warranty of reasonably accuracy.  Id. at 259-60.

This theory fully supported Agility's claim for an equitable adjustment. However, the trial court rejected Agility's theory because it found that "[DRMS] expressly declined to provide estimates to offerors, and thus cannot be held to have made a material representation upon which Agility could have justifiably relied to its detriment." (JA17.)  The trial court seemed to base its decision on DRMS's answer to discussion question 122 (which Agility posed), stating that it "[did] not have workload projections." (JA14, JA810.)  That answer was first supplied to offerors on February 26, 2007, as part of Amendment 002 to the Solicitation. (JA782, JA810.)  Almost five months later, however, by Amendment 006 to the Solicitation dated July 24, 2007, DRMS provided the Scrap Estimate, for the stated purpose of assisting offerors in preparing their proposals. (JA980, JA990-JA991.) Plainly, even if DRMS did not have estimates in February of 2007, it certainly developed and provided estimates a few months later.[25]

As explained above, the trial court should have considered the historical workload and staffing information together with the Scrap Estimate to be the

---

[25] As Washington testified at trial, estimates, at least as to workload measured by scrap weight, were available to the government. (JA527-JA529.)  And Washington knew of no way to estimate the weight and type of scrap, without some projection as to the volume of items also coming into the Contract DRMOs. (JA527-JA529.)

collective "estimate"[26] given to offerors in accordance with FAR 16.503. But even if the historical data was not part of the estimate, DRMS undoubtedly provided offerors with the Scrap Estimate.[27] The trial court correctly found that the Scrap Estimate projected workload, measured in weight, for all years (including options) of the Contract. (JA990-JA991, JA6) Thus the Scrap Estimate <u>was</u> an estimate of workload measured by weight, and was provided to offerors for use in formulating their bids. (JA990-JA991, JA1003.) The trial court was wrong when it summarily rejected Agility's argument based upon the purported absence of an estimate.

As discussed previously (<u>see</u> Tables 3, 4, 5, 6 and 8 above), however constituted, the estimate provided by DRMS was wildly inaccurate. None of the information provided to offerors contained a disclaimer. (<u>See</u> JA990-JA991,

---

[26] It was the trial court's (incorrect) view that the only estimates of workload (however measured) were generated by offerors. (JA11) Accordingly, the trial court buttressed its decision with a citation to <u>Cedar Lumber, Inc.</u>, 5 Cl. Ct. at 546. While the court in <u>Cedar Lumber, Inc.</u> did hold that that the warranty of reasonable accuracy does not apply when a bidder "warrants . . . that it relies on its own information for bidding purposes, and not the information embodied in a government estimate," it also found that principle inapplicable because the plaintiff had not provided such a warranty. 5 Cl. Ct. 547. The later point is the most pertinent in this case because, not only did Agility not warrant that it relied upon its own investigation or estimates, but the evidence before the trial court showed that Agility relied entirely upon the information provided by DRMS in developing its staffing profile. (JA1063, JA134, JA147, JA178-JA180, JA191.)

[27] At trial, Washington admitted that the Scrap Estimate was an estimate. (JA527-JA528.)

JA1667-JA1674.)  Agility had no information as to the actual workloads at the

Contract DRMOs other than that provided by DRMS.  (See JA147.)  Agility

justifiably relied on the information provided by DRMS, just as DRMS intended

that it would.   (JA134, JA191, JA507-JA508, JA522-JA523.)  Thus, Agility is

entitled to an equitable adjustment.  The trial erred by holding otherwise.

## VI.     **AGILITY PROVIDED THE TRIAL COURT WITH A REASONABLE BASIS FOR CALCULATING QUANTUM.**

Because the trial court found against Agility on the issue of entitlement, it

never reached the issue of quantum.  (See JA1-JA18.)  However, the trial court's

view that Agility had not demonstrated "cause-and-effect links to isolate its

damages" apparently weighed its decision.  (JA16-JA17.)  The trial court's

concerns about Agility's proof of damages were off base.  Agility provided more

than ample evidence to afford the trial court a reasonable basis for computation of

damages, even if approximate, and thus met its burden of proof.  See Hi-Shear

Tech. Corp., 356 F.3d at 1381.

The trial court found that, when Agility began work at DRMO Arifjan, it

discovered 70,000 line items waiting to be processed. (JA9.)  The workload

baseline, to which Agility staffed, showed approximately 9,100 line items per

month.  (JA1642.)  So, assuming it worked as efficiently as DRMS's "required"

staff, Agility inherited, *on day one*, work that would take its initial staff nearly

eight months to process.[28]  (See JA1642 (70,000 / 9,100 = 7.69).)  Additional

property turn-ins, which were substantially increased as compared to the workload

baseline, only further overwhelmed Agility.  (JA252-JA253, JA257-JA258.)

Agility encountered backlog and greatly increased workloads across the Contract

DRMOs (not including DRMO Speicher).  (JA253.)

Faced with the inherited backlog, skyrocketing incoming workloads, and

DLA's threat to terminate the Contract, Agility had to recruit and hire the

personnel needed to get the job done.  (JA261-JA267.)  Agility augmented its

initial staff based on the actual workload, not that reflected by DRMS's estimate.

(JA261-JA267.)  However, as part of its certified claim, Agility directly correlated

the surge in workload to additional positions created.  (JA3291-JA3301, JA3332-

JA3368.)  Agility broke down the cost of those positions, on a monthly basis, and

provided proof of the cost and payment to the trial court.  (JA294-JA297, JA307-

---

[28] The trial court also declined to interpret H.19.  But even if it applied, the backlog
at Arifjan alone warranted an increase in staffing under the T&M CLIN.  To be
150% above the workload baseline, the actual workload would have to be 2.5 times
the baseline.  2.5 * 9100 (Arifjan workload baseline) = 22,750.  And that work
would have to be expected to continue for at least two months.  70,000 line items
of backlog / 22,750 (per month) = 3.0769 months.  Thus, on day one, without
consideration of the increased workload, Agility would have been entitled to
additional personnel under Clause H.19.

JA309, JA432-JA471, JA3332-JA3368.)[29]  From the foregoing, the trial court had more than enough evidence to reasonably approximate Agility's damages. Although not meant in any way to limit any other calculation of damages, if the trial court wanted an even more direct "cause-and-effect" relationship, it needed only to compare Agility's initial proposed staffing to DRMS's "required" staffing at DRMO Arifjan.

As the trial court found, 60% of the work under the Contract occurred at DRMO Arifjan.  (JA9.)  DRMS informed offerors that it "required" 100 individuals to operate DRMO Arifjan.  (JA1642.)  At the time of that representation, DRMS knew that workloads would increase to a level beyond the capacity of its 100 "required" staff members.  (JA501-JA502.)  Agility considered the size of DRMS's "required" staff when preparing its proposal, but did not know that DRMS believed that level of "required" staffing to be inadequate.  (JA135-JA136.)  Consequently, based upon the information provided by DRMS, Agility proposed to staff DRMO Arifjan with only 68 individuals.  (JA1176.)

---

[29] Because the Court is not reviewing a decision on damages, Agility will not burden the record with the voluminous documentation of damages that it presented to the trial court.  Instead, Agility has included in the record only its "surge correlation charts" and the testimony of Agility's damages witnesses, identifying and explaining the other evidence of damages before the trial court.

Had Agility known that DRMS anticipated a need for more than 100 individuals at Arifjan, it would have taken that fact into account in building its own staffing profile. (JA136-JA137.) It is more than reasonable to assume that, with the benefit of that information, Agility would have proposed an initial staff at DRMO Arifjan at least equal to the 100 that DRMS represented to be "required." The cost of those additional 32 staff members, which Agility employed, without additional compensation, for the balance of the period of performance, is a material portion of the approximately $6,900,000.00 that Agility sought. Clearly, the trial court had before it more than enough evidence from which it could reasonably calculate Agility's damages. The trial court's contrary conclusion impacted its decision as to entitlement, and was clearly erroneous.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court should be reversed.

Respectfully submitted,

/s/ W. Brad English
W. Brad English
Jon D. Levin
J. Andrew Watson, III
Emily Jones Chancey

**OF COUNSEL:**

MAYNARD, COOPER & GALE, P.C.
655 Gallatin Street
Huntsville, Alabama 35801
Telephone: (256) 551-0171
Fax: (256) 512-0119
benglish@maynardcooper.com
jlevin@maynardcooper.com
awatson@maynardcooper.com
echancey@maynardcooper.com

*Attorneys for Appellant*

# In the United States Court of Federal Claims

Nos. 13-55C, 13-97C (Consolidated)

(Filed: August 18, 2015)

*****************************************

|  |  |
|---|---|
| AGILITY DEFENSE & GOVERNMENT SERVICES, INC., <br><br> Plaintiff, <br><br> v. <br><br> THE UNITED STATES, <br><br> Defendant. | Government Contract Claim for Disposal of Surplus Property in Middle East; Requirements Contract; Firm-Fixed-Price; Reasonableness of Historical Data; Constructive Change Claim; Assumption of Risk. |

*****************************************

*W. Brad English*, with whom were *J. Andrew Watson III, Jon D. Levin,* and *Emily D. Chancey*, Maynard Cooper & Gale, P.C., Huntsville, Alabama, for Plaintiff.

*Michael D. Austin*, with whom were *Veronica N. Onyema*, Trial Attorney, *Joyce R. Branda*, Acting Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, and *Kenneth M. Dintzer*, Deputy Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., *James Hewitt*, Defense Logistics Agency, Of Counsel, for Defendant.

## OPINION AND ORDER

WHEELER, Judge.

This case involves a claim for increased costs arising from a firm-fixed-price government contract between Agility Defense & Government Services, Inc., Huntsville, Alabama ("Agility")[1] and the Defense Reutilization Management Services, an arm of the Defense Logistics Agency. The contract called for Agility to dispose of surplus property received from the military services as troops were departing from areas of operation in Iraq, Afghanistan, and Kuwait. Agility seeks approximately $6,900,000 in labor costs it

---

[1] The party named in the contract is Taos Industries, Inc., a subsidiary of Agility. For simplicity, all references to Agility in this opinion shall include Taos Industries.

incurred to process property in excess of anticipated quantities. The case is governed by the Contract Disputes Act, 41 U.S.C. § 7101 et seq.,

Agility submitted two certified claims to the contracting officer, the first on January 31, 2012 for $4,359,071.79 covering the period April 1, 2008 through March 26, 2009, and the second on February 6, 2012 for $1,602,148.67 covering the period March 27, 2009 through June 30, 2010.[2] The Government terminated the contract for convenience on June 30, 2010, after approximately 27 months of Agility's performance. In addressing Agility's certified claims, the contracting officer issued two final decisions on June 14, 2012, finding that Agility was entitled to $236,363.93 on the first claim, but zero on the second claim. Agility timely appealed these final decisions to this Court on January 23, 2013 and February 5, 2013 respectively, and they were docketed as case numbers 13-55C and 13-97C. By order dated April 2, 2013, the Court consolidated these two actions for all purposes.

The case involves an unusually high-risk contract where the contractor, Agility, was responsible for disposing of all property received at designated locations regardless of quantity, and yet the compensation to the contractor was on a firm-fixed-price basis. If the quantities were significantly higher than expected, as they were, the chances of exceeding the firm-fixed-price were great. The Court must determine which party, Agility or the Government, assumed the risk that the costs of performance would be higher than anticipated.

This contract also was a first of its kind, as previously the Defense Reutilization Management Services performed surplus property disposal on its own. The Court must consider the reasonableness of the historical quantities provided by the Government, and Agility's own estimates of costs for its contract proposal. Mitigating the contractor's risk somewhat was a provision allowing Agility to keep the revenue it received from the sale of scrap material under the contract. Thus, if contract quantities were higher than expected, theoretically the contractor's revenue from the sale of scrap also would be higher. In this way, the contractor would receive scrap revenue offsetting its contract performance costs.

The Government drafted a clause, H.19 "DRMO Workload Changes," which was aimed at adjusting the contract price if quantities were substantially higher or lower than expected. This clause had never been used before, and as will be seen, its provisions were so complex and uncertain that it offered essentially no protection at all to the contractor. Nevertheless, clause H.19 received considerable attention and dialogue during performance, and therefore is relevant in understanding the actions of the parties.

---

[2]  Agility amended its claim amounts after it filed suit, increasing the claims to $4,932,118.89 and $1,974,220.31 respectively. See December 19, 2013 Motion for Leave to Amend (Dkt. No. 13), granted by the Court on December 30, 2013.

The Court conducted a three-day trial in Huntsville, Alabama during January 27-29, 2015. The six witnesses at trial were: Doug Baker, Agility's Marketing Manager and Vice-President of Business Development; Karen Chillcott, Agility's Vice-President of Contracts and Procurement; Roy Mohr, Agility's Program Manager; Hobie Frady, Agility's Chief Financial Officer and Proposal Manager; James Washington, a Government Contracting Officer; and Marlowe Burns, a Contracting Officer's Representative. The parties filed proposed post-trial findings of fact and conclusions of law on April 24, 2015, and post-trial response briefs on May 21, 2015. The Court heard closing arguments in Washington, D.C. on June 25, 2015.

For the reasons explained below, the Court finds that the Government's estimated quantities provided to prospective offerors were based on accurate historical data. Even though the estimates proved to be low in comparison to the actual quantities encountered during contract performance, the Government was not negligent in furnishing the historical data. To be sure, Agility assumed a higher than normal risk in agreeing to a contract of this type, but that was a choice it voluntarily made. In a firm-fixed-price contract like this one, the contractor assumes the risk of controlling its costs of performance, unless it can show that the Government's estimates of quantities were negligent in some respect. The evidence does not support Agility's attempt to shift the risk to the Government, and therefore Agility's claims are denied.

## Findings of Fact[3]

### A. Background

The Defense Logistics Agency ("DLA") provides supplies to the military services and supports Department of Defense acquisition activities. Stip. ¶ 1. The Defense Reutilization Management Services ("DRMS") is a primary field activity of DLA. Id. DRMS is responsible for the disposal of all excess personal property generated by the military services worldwide. Stip. ¶ 2. To accomplish its mission, DRMS has established Defense Reutilization and Marketing Offices ("DRMOs") at locations throughout the world. Id. Each DRMO is a receiving and processing facility for surplus property. Stip. ¶ 3; Mohr, Tr. 156.

The Government employs a record-keeping system to keep track of surplus property received, and the type and amount of the property in its inventory.[4] Once the property is

---

[3] The Findings of Fact are based upon the evidentiary record created at trial. Citations to the record in this opinion are as follows: (1) January 14, 2015 Joint Stipulations of Fact (Stip. ¶ __); (2) Trial testimony (Witness name, Tr. ___); (3) Joint Exhibits, JX __; (4) Plaintiff's Exhibits, PX __; and (5) Defendant's Exhibits, DX __.

[4] When surplus property is turned in at a DRMO, it is accompanied by a Defense Turn-in Document ("DTID"). The DTID describes the property before it is placed in a physical inventory. Mohr, Tr. 157.

received, it is designated for reutilization by the military, or it is reduced to scrap. Mohr, Tr. 160-61. Some items must be demilitarized before they are converted to scrap. Mohr, Tr. 161. The Government employs two computer programs to facilitate the management of the surplus property. One program is known as "DAISY" and the other is known as "MIDAS." Mohr, Tr. 159; Burns, Tr. 480. The DAISY program is the information database, and the MIDAS program is the search tool that extracts information from DAISY. Mohr, Tr. 162-63; Burns, Tr. 480. Information entered into the DAISY program typically becomes accessible within 18-24 hours. Burns, Tr. 552.

Prior to 2007, the Government performed in-house all of the work relating to the receipt and processing of surplus property. Stip. ¶ 4. In December 2006, the Director of DRMS determined that the agency could not adequately support the surplus property functions in the future. Washington, Tr. 416-17. Agency management was concerned that the "planned movement of U.S. Military forces" would create more work than the agency could handle. JX 20 at 2. At that point, the agency decided to solicit and award an outside contract for this work. Stip. ¶ 4; Washington, Tr. 416-17.

B. The Solicitation

On January 18, 2007, DRMS issued Solicitation No. SP4410-07-R-007 seeking a contractor to perform all surplus property disposition services at six locations in Southwest and Central Asia. Stip. ¶ 5; JX 2. The six locations were at Bagram, Afghanistan; Camp Arifjan, Kuwait; and Camps Anaconda, Victory, Al Asad, and Speicher, Iraq. JX 2. In Block 7 of the coversheet to the Solicitation, the Government explained:

> All potential firms should understand that this [Request for Proposal] is accompanied by a Statement of Objective (attachment 1). The goal is for firms to develop and submit a Performance Work Statement that will outline in detail how it proposes to fulfill the mission requirements of DLA/DRMS. Firms are encouraged to where practical offer efficient commercial solutions that will enhance the mission while at the same time reduce cost.

Id. at 1. The Solicitation as amended contemplated the award of a single contract for a base year and four one-year options. Id. at 48; JX 4 at 6.[5] The Government planned to award a combined firm-fixed-price, time and materials, and cost reimbursement contract. JX 4 at 6. The firm-fixed-price portion covered the first six contract line items, one for each of the six designated locations, and the time and materials portion covered other locations within Iraq, Afghanistan, or Kuwait where work might be required. Id. at 7-12.

---

[5] There were at least nine amendments to the Solicitation, although not all of them are included in the evidentiary record. See JX 2 – JX 8.

4

However, the contract is predominantly for a firm-fixed-price, and only the firm-fixed-price line items are at issue in this case. Section M of the Solicitation as amended stated that award would be made on a best value basis, considering past performance, price and the other evaluation factors listed. Id. at 57.

In Amendment 004 to the Solicitation, the Government added clause H.19, "DRMO Workload Changes," that stated:

> During operation of the DRMO locations, the contractor may experience significant workload increases or decreases. When workload increases at any DRMO location by more than 150% above the average workload at the DRMO location for the preceding three (3) consecutive months and a determination is made jointly by the [Contracting Officer's Representative] and On-site contractor representative that the increase will continue for more than two (2) months and contractor staff at the DRMO is insufficient to manage the workload increase, the contractor may submit a proposal to add labor and materials to handle the increase under the Time and Material CLINs. When there is a significant workload decrease at a DRMO that has not experienced a significant workload increase, and the decrease extends to three (3) consecutive months, the Government shall have the right to terminate the CLIN that covers the DRMO and renegotiate the price paid the contractor to operate the DRMO. When the Government notifies the contractor in writing of its intent to terminate the CLIN for the purpose of renegotiation, the contractor will be required to submit a proposal to continue operating the DRMO based upon the average workload at the location for the previous six (6) months excluding surges or significant workload increases.

JX 4 at 26-27. The Government designated this clause as "DRMS (Feb 2007)," indicating that clause H.19 was a new clause drafted for this contract. Id.; Washington, Tr. 428.

The Government finalized the scrap sales provisions in the Solicitation, Amendment 004, stating:

> Proceeds. The contractor is entitled to all sales proceeds collected excluding customs duties and fees. The Government anticipates such sales will offset some of the costs incurred in performing this contract. Offerors must outline in their proposals how they will conduct and enhance the sale of scrap and other property to achieve the highest revenue and show

5

how its overall offer for this contract was reduced based on these anticipated sales.

JX 4 at 84.

Amendment 004 to the Solicitation contained a listing of the questions and answers between the agency and the offerors prior to the Preproposal Conference. JX 4 at 131-58. Question 122 asked the Government to provide the workload history and projection by category and location. The Government responded by stating "[w]orkload history and current inventory levels can be found at http://www.drms.dla.mil/newproc/index and link to 'DRMS information for Southwest/Central Asia.' The Government does not have workload projections." JX 21 at 201-02.

The agency's website contained historical workload information for each of the six DRMO locations covered by the contract. Washington, Tr. 421-22, Baker, Tr. 43. The agency updated the website's workload data on a regular basis. Washington, Tr. 422. The workload was measured by the weight of scrap processed and by the number of line items. Baker, Tr. 43, 47, 48. The website also showed the number of direct and contract staff members employed by DRMS at each location. Baker, Tr. 48; JX 50 at 3; JX 59 at 4; JX 66 at 4; JX 73 at 3; JX 76 at 4; JX 80 at 4. DRMS used the workload data for August 4, 2007 as the baseline when issuing delivery orders under the contract. Id.

Amendment 007 to the Solicitation contained a two-page spreadsheet showing the amount of scrap "turn-ins" to expect over the life of the contract. JX 6 at 11-12. The spreadsheet showed the number of expected turn-ins by weight for each of the six DRMO locations for the base year and each option year in the following categories: non-ferrous, ferrous, tires, rubbish, scrap vehicle, fuels/oils, electronic, and other. Id. Amendment 007 contained questions and answers with offerors added since the issuance of Amendment 004. Question 61 asked in part "[p]ut another way, does this proposition stand for an expectation that offerors should not be able to retain scrap revenues 'free and clear' without some reduction being reflected in the overall offer for this contract." Id. at 31. The Government responded:

> The contractor will be able to keep the proceeds from the sale of scrap "free and clear" without any type of reduction in payments. The Government requests that offerors describe their sales plan as well as reflect that amount of anticipated proceeds and how this was considered in their bid. The purpose of the requirement is to show how the bid price was influenced by anticipated proceeds and to demonstrate the Government received consideration for providing the scrap as [Government-furnished material] under this contract.

6

<u>Id.</u> at 32.

Prior to 2007, Agility acquired Taos Industries, Inc., a small firm based in Huntsville, Alabama. Taos specialized in performing logistics contracts for the U.S. Government, but it had not previously operated a DRMO. Baker, Tr. 38. Agility hired three former DLA employees to provide expertise in preparing its proposal in response to the Solicitation, including the development of a Performance Work Statement ("PWS"). Baker, Tr. 39.

Agility was one of three offerors to submit a proposal in response to the Solicitation. Stip. ¶ 14. The agency's Source Selection Authority determined that Agility's proposal provided the best overall value to the Government. Agility's final price was $45,233,914.92. Baker, Tr. 68; JX 16 at 8. The final price reflected a $20,342,608.00 offset for revenues expected from scrap. JX 10 at 17. Agility's proposal was based upon a staffing plan of 174 persons. Baker, Tr. 40; JX 10 at 35-38.

C. <u>The Contract</u>

DRMS notified Agility on November 29, 2007 that its proposal had been accepted for award. Stip. ¶ 16. The parties executed Contract No. SP4410-08-D-2000 ("the Contract") on the same day. JX 21. The Contract contained six line items, one for each of the DRMO locations, and each line item had a firm-fixed-price to be paid on a monthly basis. <u>Id.</u> at 51. The Contract also contained clause H.19, "DRMO Workload Changes." However, the version of clause H.19 in the Contract had been modified slightly to address potential workload decreases:

> During operation of the DRMO locations, the contractor may experience significant workload increases or decreases. When workload increases at any DRMO location by more than 150% above the average workload at the DRMO location for the preceding three (3) consecutive months and a determination is made jointly by the [Contracting Officer's Representative] and On-site contractor representative that the increase will continue for more than two (2) months and contractor staff at the DRMO is insufficient to manage the workload increase, the contractor may submit a proposal to add labor and materials to handle the increase under the Time and Material CLINs. When there is a significant workload decrease *in excess of 50% or more* at a DRMO that has not experienced a significant workload increase, and the decrease extends to *four (4)* consecutive months, the Government shall have the right to terminate the CLIN that covers the DRMO and renegotiate the price paid the contractor to operate the DRMO. When the Government

7

notifies the contractor in writing of its intent to terminate the CLIN for the purpose of renegotiation, the contractor will be required to submit a proposal to continue operating the DRMO based upon the average workload at the location for the previous six (6) months excluding surges or significant workload increases.

JX 21 at 71-72 (changes shown in italics). This version of clause H.19 was designated as "DRMS (JUL 2007)."

The agency ordered work under the Contract by placing Delivery Orders for each DRMO site. Washington, Tr. 453. The initial Delivery Orders were issued in January and February 2008. The Delivery Orders incorporated the "workload baseline" for each DRMO site as reflected by the historical data in the website update for August 4, 2007. The agency calculated the monthly baseline from the August 4, 2007 website update by adding together the two figures for "Received Line Items," each for a one-week period, and then doubling the total to obtain the monthly line items. The baselines were as follows:

| DRMO | Monthly Baseline | Annualized Baseline |
|---|---|---|
| Speicher | 1,064 | 12,768 |
| Victory | 1,166 | 13,992 |
| Al Asad | 1,218 | 14,616 |
| Anaconda | 1,662 | 19,994 |
| Arifjan | 9,130 | 109,560 |
| Bagram | 540 | 6,480 |

JX 50 at 3; JX 59 at 4; JX 66 at 4; JX 73 at 3; JX 76 at 4; JX 80 at 4; PX 114 at 2. The annualized baselines are derived simply by multiplying the monthly baseline by twelve.

From the beginning of performance, the actual workload experienced at each of the six DRMO locations, with the exception of Camp Speicher, Iraq, was much greater than the workload baselines established in the August 4, 2007 Historical Data. Mohr, Tr. 172; PX 114 at 1-3, JX 186 at 1-2. The actual annual workloads experienced from March 2008 to March 2009, by number of line items, were as follows:

| DRMO | Actual Workload | % of Annualized Baseline |
|---|---|---|
| Speicher | 9,561 | 74.9% |
| Victory | 21,899 | 156.5% |
| Al Asad | 24,392 | 166.9% |
| Anaconda | 71,653 | 358.4% |
| Arifjan | 242,401 | 221.3% |
| Bagram | 15,364 | 237.1% |

In total, the pre-March 2009 workload for all six locations was 217.2% of the annualized workload derived from the single-month baseline provided in the Delivery Orders.

Agility began contract performance at Camp Arifjan, Kuwait, where more than 60% of the contract work would be performed. At Arifjan, Agility inherited a backlog of approximately 70,000 line items. Mohr, Tr. 168, 271; Burns, Tr. 556-57. In addition to the backlog, the volume of property received at Arifjan was greater than anticipated from the very beginning. Mohr, Tr. 172. Agility did not have the necessary staff in place to process both the backlog work and the higher than expected level of new work. Baker, Tr. 82-83; Mohr, Tr. 167.

In May 2008, Agility began performance at the other five DRMO locations. JX 166. Agility encountered backlogs at these locations as well, but not to the same extent as the Arifjan backlog. Burns, Tr. 559-60. Early in contract performance, Lt. Gen. Dail, Director of DLA, visited the DRMO locations to assess the status of the work. Stip. ¶ 18; Mohr, Tr. 176. On June 8, 2008, Lt. Gen. Dail convened a meeting of DRMS personnel and Agility's senior staff to address Agility's performance issues. Stip. ¶ 18; Mohr, Tr. 175-76. Lt. Gen. Dail informed Agility that he would terminate the contract if Agility's performance did not improve. Mohr, Tr. 176.

Concurrently with Lt. Gen. Dail's visit to the DRMO locations, Contracting Officer Karen Hammontree sent a June 6, 2008 letter to Agility describing the staffing and other problems Agility was encountering at the DRMO locations. JX 163. On June 12, 2008, William Pratt, Agility's Vice President of Operations, responded that, "our planning wasn't perfect and we underestimated resource requirements in some areas. We are making staffing and automation adjustments where appropriate." JX 166 at 1.

Following the meeting with Lt. Gen. Dail, Agility submitted a Corrective Action Plan to the Government addressing the identified deficiencies in performance, most of which related to additional staffing needs, and in some cases, additional equipment. Mohr, Tr. 176-79; JX 167. John Hamilton, President and CEO, stated that he would increase the staffing at the DRMOs "by more than 50% at no additional cost to the [G]overnment." JX 167 (email transmission). Agility hired 105 extra personnel, 66 of which were assigned to Camp Arifjan. Mohr, Tr. 180-81; JX 167. Agility also dispatched fifteen additional employees from its headquarters to improve Agility's performance. Mohr, Tr. 182. Agility understood that the initial number of staff assigned to the Contract was insufficient and that more employees would be needed. Mohr, Tr. 167, 224.

Despite Agility's assertion that there would be no additional cost to the Government, Agility attempted to obtain the Government's consent to fund its additional personnel. Mohr, Tr. 174-75, 186, 314-17. The Government was aware that Agility had added extra staff and was processing work in excess of the Delivery Order baselines, but insisted that

the requirements of clause H.19 had not been met. Mohr, Tr. 314-17. In order to warrant a funding adjustment, clause H.19 required an increase above 150% of the workload for the previous three months. Since the workload from the beginning of performance was high, there never was a time that the increase was above 150%. Agility did not submit a formal proposal to increase staff under clause H.19. Mohr, Tr. 296.

In March 2009, after months of dialogue, the parties entered into a bilateral modification amending clause H.19 so it would apply whenever the workload was more than 25% above the fiscal year 2008 average for a given DRMO location. JX 35 at 2-3.

On November 13, 2008, the Government exercised the first option year. JX 31. During the entire period of contract performance, Agility realized $44,182,364.35 in scrap sales. DX 7 at 11. In the fall of 2009, Public Warehouse Company ("PWC"), the parent company of Agility, was accused of fraud against the United States, and PWC and its affiliates, including Agility, were barred from contracting with the Government. On June 30, 2010, the Government terminated the contract for convenience. Stip. ¶ 23. On June 29, 2011, Agility submitted a claim for termination settlement costs in the amount of $2,194,509.56. JX 48 at 2. On December 20, 2012, the parties negotiated a settlement of this claim for $757,972.63. Id.

## Discussion

### A. Jurisdiction

This Court has jurisdiction over claims for an equitable adjustment to a government contract pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1). The Court hears contractor appeals from the final decision of a contracting officer under the Contract Disputes Act, 41 U.S.C. § 7104(b). Agility timely appealed from the contracting officer's final decisions within twelve months from receipt. Id.

### B. Standard of Review

The Court reviews an appeal of a contracting officer's final decision *de novo* under 41 U.S.C. § 7104. Case law interpreting the Contract Disputes Act makes clear that "when suit is brought following a contracting officer's decision, the findings of fact in that decision are not binding upon the parties and are not entitled to any deference." Wilner v. United States, 24 F.3d 1397, 1401 (Fed. Cir. 1994); see also Assurance Co. v. United States, 813 F.2d 1202, 1206 (Fed. Cir. 1987). Once an appeal is taken, the contractor "has the burden of proving the fundamental facts of liability and damages de novo." Servidone Constr. Corp. v. United States, 931 F.2d 860, 861 (Fed. Cir. 1991). A contractor is not entitled to the benefit of any presumption arising from the contracting officer's decision. Id. *De novo* review precludes reliance upon the decision's presumed correctness. Id.

(citation omitted). "Thus, once an action is brought following a contracting officer's decision, the parties start in court . . . with a clean slate." Wilner, at 1402.

## C. Type of Contract

A threshold inquiry in this case is to determine the type of contract at issue. The parties agree that this was mainly a firm-fixed-price contract. Regarding the quantity term, there are three possible types of supply contracts: those for a definite quantity, those for an indefinite quantity, and those for requirements. Crown Laundry and Dry Cleaners, Inc. v. United States, 29 Fed. Cl. 506, 515 (1993). The question here is whether the contract is one for a definite quantity, as the contract itself states, or for requirements, as Agility claims. The Court is not bound by the name or label included in the contract itself. Id. Rather, it must "look beyond the first page of the contract to determine what were the legal rights for which the parties bargained, and only then characterize the contract." Id. "[I]f a contract is susceptible of interpretation as . . . one for requirements . . . the court should uphold it as of the requirements type." Ralph Constr., Inc. v. United States, 4 Cl. Ct. 727, 732 (1984); A-Transport Northwest Co. v. United States, 27 Fed. Cl. 206, 214 (1993).

A definite quantity contract contemplates a "fixed, definite quantity of goods or services be purchased and provided." Ralph Constr., 4 Cl. Ct. at 731 (citation omitted). A contract that provides only estimates and not definite quantities is not a definite quantity contract. See Rice Lake Contracting, Inc. v. United States, 33 Fed. Cl. 144, 152 n.9 (1995). On the other hand, a requirements contract is formed when the seller has the exclusive right and obligation to fill all of the buyer's needs for the goods or services described in the contract. Modern Sys. Technology Corp. v. United States, 979 F.2d 200, 205 (Fed. Cir. 1992). An essential element of a requirements contract is the promise by the buyer to purchase the contract subject matter exclusively from the seller. Id.

Here, the contract is labeled as a definite quantity contract. JX 4 at 31-32 (adding "Definite Quantity" clause, FAR 52.216-20, to Solicitation). However, the Solicitation referred only to historical quantities processed at each DRMO site, which were intended for offerors to use in forming their own estimates for staffing the DRMOs. The Government agrees that it "used [Agility] exclusively to perform all services required under the contract" and there was "no limit on the number of orders that may be issued." The Government sought a contractor that would perform "all tasks DRMS performs in support of the Department of Defense mission." JX. 2 at 50. Thus, the Court concludes that Agility's contract with the Government was a requirements contract.

More important, however, is that the contract was one for a firm-fixed-price. "Where one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation, because unforeseen difficulties are encountered." Northrop Grumman Corp. v. United States, 47 Fed. Cl. 20, 56 (2000) (quoting United States v. Spearin, 248 U.S. 132, 136 (1918)). "In firm fixed-price

contracts, risks fall on the contractor, and the contractor takes account of this through his prices." McNamara Constr. of Manitoba, Ltd. v. United States, 509 F.2d 1166, 1170, 206 Ct. Cl. 1, 8 (1975). The assumption of risk in the contract is more material to the Court's analysis than the quantity term.

### D. Effect of Clause H.19

Agility argues that clause H.19 is not a valid economic price adjustment clause under the Federal Acquisition Regulation ("FAR"), and that clause H.19 is inapplicable because it has no discernible effect. Agility established at trial that clause H.19 is complex and confusing, a conclusion that the Court readily accepts upon a full reading. Agility also argues that clause H.19 does not foreclose Agility's other avenues of recovery because of the Government's alleged withholding of superior knowledge. In response, the Government argues that clause H.19 is a valid economic price adjustment clause and is the exclusive vehicle for Agility to recover costs for increased workloads.

The Court need not determine the precise meaning of clause H.19 because it was agreed upon by the parties and Agility never challenged it until after contract performance had begun. In fact, Agility addressed clause H.19 in its proposal in a section entitled "Handling Workload Increases (H.19)." JX 21, at 285. Agility acknowledged that "[w]hen it is clear that a surge is imminent, our DRMO Site Managers will hire additional . . . personnel, and transfer them to the appropriate location. . . . The impact of workload surges will be mitigated by our continuous and open communications with generators and other customers. By working closely with customers to understand their projected requirements, we can plan for surges and shift resources to meet those requirements." Id.

In interpreting proposed contract provisions appearing in a solicitation, the Federal Circuit has held that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims." Blue and Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1313 (Fed. Cir 2007). The reasoning of Blue and Gold "applies to all situations in which the protesting party had the opportunity to challenge a solicitation before award and failed to do so." COMINT Sys. Corp. v. United States, 700 F.3d 1377, 1382 (Fed. Cir. 2012). Agility claims that clause H.19 is so patently confusing and useless that it should be ignored, yet Agility agreed to clause H.19 and referenced the clause in its proposal. Although the Court agrees that the clause is difficult to employ and potentially unhelpful, it nevertheless declines to relieve Agility from the contract terms to which it expressly agreed.

Further, as will be explained, the Court does not need to address whether clause H.19 forecloses Agility's claims of constructive change or negligent estimate because those claims otherwise fail on their merits. The Government did not act negligently or culpably

in the solicitation process.  For the reasons stated below, the Government did not legally err when it provided historical workload data in the Solicitation instead of creating projections or estimates.

### E.  Agility's Theories of Recovery

For its pre-March 2009 claim, Agility advances three theories in support of its equitable adjustment claim:  (1) that a constructive change occurred; (2) that the information provided to offerors during the competitive acquisition phase constituted a negligent estimate; and (3) that DRMS breached the warranty of reasonable accuracy regarding the information provided during the competitive acquisition phase.

### 1.  Constructive Change

A constructive change occurs when the contractor performs work exceeding the contractual requirements, without a formal change order, either because of an informal government order or through the fault of the government.  LB&B Assocs. Inc. v. United States, 91 Fed. Cl. 142, 153 (2010).  The change component of a constructive change requires proof of work not required by the contract.  Delhur Indus., Inc. v. United States, 95 Fed. Cl. 446, 461 (2010).  The order/fault element requires proof that the additional work was caused by the government.  Miller Elevator Co. v. United States, 30 Fed. Cl. 662, 678 (1994).  When proceeding under the "fault" theory, the contractor must demonstrate a deficiency in the contract, such as a defective specification or non-disclosure, or some misconduct by the government in the administration of the contract.  Id.  This is the only theory that Agility advances.

Agility contends that a constructive change occurred based upon DRMS's non-disclosure of its superior knowledge about scrap estimates and troop movements.  A constructive change predicated upon the government's non-disclosure of superior knowledge is proven by demonstrating the following: (1) "a contractor undertook to perform without vital knowledge of a fact that affects performance costs or duration;" (2) "the government was aware the contractor had no knowledge of and had no reason to obtain such information;" (3) "any contract specification supplied misled the contractor or did not put it on notice to inquire;" and (4) "the government failed to provide the relevant information."  Id. at 675.  The Government argues that Agility does not actually advance any evidence of a constructive change, but instead "contests the Government's method of informing offerors of the possibility that the workload the contractor was required to handle could fluctuate."  Gov.'s Reply at 11.  According to the Government, Agility is basically arguing that providing historical workload data was the wrong choice, and the Government should have provided estimates and projections instead.  Weighing these positions, the Court agrees with the Government.

13

Amendment 4 to the Solicitation contained questions and answers from prospective offerors, which included Question 11:

> Technical Exhibit (TE) -1, Para (a) – Offerors are required to anticipate variations in property flow during the contract. Considering the current increase in war fighters and plans to reduce troop strength during the life of the contract, variations in flow should be substantial. Therefore, to help alleviate pricing contingencies, could the government estimate the magnitude of the flow variations?

JX 4, at 135. The Government answered, "[w]e anticipate an increase in property turn-ins." Id. The Government also explicitly declined to provide workload projections. JX 21 at 202. It did, however, provide historical workload data.

Agility offered no evidence at trial that DRMS had knowledge of specific planned troop movements, or even how this knowledge would have been helpful to Agility in staffing the DRMOs. Agility presented no evidence that troop movements are predictable, reliable events, and the Court finds that the opposite is likely true in a warzone environment. Predicting troop movements over the coming year is akin to asking the Government "to be clairvoyant," which it is not required to do. See Service Technicians, Inc. v. United States, 37 Fed. Cl. 383, 387 (1997) (quoting Womack v. United States, 389 F.2d 793, 802, 182 Ct. Cl. 399, 412-13 (1968)). In fact, any scrap estimates based on forecasted troop movements would likely be inaccurate, and potentially more misleading than historical workload data.

Further, Agility's argument that the Government possessed "estimates" that it withheld from offerors is not persuasive. The Government's decision not to provide estimates does not amount to fault or superior knowledge. The Federal Circuit has held that a decision to provide reasonably available historical data instead of generating estimates for a complex contract is reasonable, and the Government need not "search for or create additional information." Medart, Inc. v. Austin, 967 F.2d 579, 582 (Fed. Cir. 1992). The Court finds that Agility cannot criticize the Government for providing historical data instead of estimates. The Government did not constructively change the contract by failing to provide estimates of future troop movements.

### 2. Negligent Estimate

Although similar in theory, a contractor's right to disclosure of the Government's superior knowledge is not coextensive with a contractor's right to non-negligent estimates in requirements contracts. Fed. Group, Inc. v. United States, 67 Fed. Cl. 87, 102 (2005). When awarding a requirements contract, the FAR requires the Government to provide an estimate of its contract requirements in the solicitation. According to FAR 16.503(a)(1):

> For the information of offerors and contractors, the contracting officer shall state a realistic estimated total quantity in the solicitation and resulting contract. This estimate is not a representation to an offeror or contractor that the estimated quantity will be required or ordered, or that conditions affecting requirements will be stable or normal. The contracting officer may obtain the estimate from records of previous requirements and consumption, or by other means, and should base the estimate on the most current information available.

Government estimates are "not guaranteed, [but] bidders are ordinarily entitled to rely on estimates as representing honest and informed conclusions when preparing their bids." Ravens Group, Inc. v. United States, 112 Fed. Cl. 39, 50 (2013). Where a contractor can demonstrate by a preponderance of the evidence that estimates were "inadequately or negligently prepared, not in good faith, or grossly or unreasonably inadequate at the time the estimate was made[,]" the Government can be held liable for resulting damages. Medart, Inc., 967 F.2d at 581 (quoting Clearwater Forest Indus., Inc. v. United States, 650 F.2d 233, 239, 227 Ct. Cl. 386, 395 (1981)).

Agility cites cases where a contractor was granted an equitable adjustment after a negligent government estimate, primarily relying on Crown Laundry, 29 Fed. Cl. 506, and Chemical Technology, Inc. v. United States, 645 F.2d 934, 227 Ct. Cl. 120 (1981). In Crown Laundry, the Government negligently overestimated its needs for laundry and dry cleaning services in a fixed-price requirements solicitation. In forming its estimates, the Contracting Officer's Representative ("COR") simply asked the Redstone Arsenal's using activities to determine the types and quantities of services anticipated for the coming year. The COR used these estimates *instead of* providing pickup and delivery tickets from the previous year, or verifying the estimates by other means. This Court found that the Government negligently and inaccurately estimated its needs in the solicitation. The Court noted that the Government "is not free to carelessly guess at its needs." Crown Laundry, 29 Fed. Cl. at 520 (quoting Medart, 967 F.2d at 581). Importantly, the Court stressed that if the COR had "felt it unnecessary to search for or to create additional information since using activities are supposed to know their needs," it would be "hard to criticize the government if subsequently, the estimates turned out to be higher than later events established they should have been." Id. at 523. However, the COR in Crown Laundry had reason to believe the estimates were exaggerated, and were likely careless guesses. Thus, the COR should have verified the estimates with actual pickup and delivery tickets.

Contrary to Agility's characterization, the facts in the present case establish the opposite scenario. Rather than carelessly forming estimates by asking the DRMOs to guess their upcoming needs, DRMS provided objective, historical workload data from which the

offerors could extrapolate future needs. The Government indicated to offerors that the property turn-ins would increase, and troop drawdowns were publicly anticipated. Agility's analogy to <u>Crown Laundry</u> must fail.

In <u>Chemical Technology</u>, the Navy invited bids for the procurement of mess attendant services in a food service building at the Naval Construction Battalion Center in Port Hueneme, California. 227 Ct. Cl. 120. The contract included a price adjustment clause, but otherwise was for fixed-price requirements. <u>Id.</u> at 122-23. The Chief Warrant Officer ("CWO") prepared a monthly meal estimate for the contract by asking the personnel offices to provide their anticipated manpower in the coming year. <u>Id.</u> at 125. The CWO also consulted the previous year's meal count and barracks records to derive a percentage "utilization factor." <u>Id.</u> The CWO was guided by Naval Supply Systems Command Instructions, which required him to base estimates on recent past experience and adjust them for "known or anticipated changes." <u>Id.</u> at 126. The Naval Supply System Instructions also required the CWO to itemize nonrecurring events, or "Special Events." <u>Id.</u> The CWO completely omitted Special Events from the solicitation and the contract.

The CWO was or should have been aware that reserve battalions sometimes conducted a two-week active duty for training at Port Hueneme, and two such battalions were on the base and eating at the CWO's mess hall at the time he was compiling the estimates. <u>Id.</u> at 127-28. Still, the CWO failed to include reserve battalion training in the estimates for offerors. Thus, offerors had "no notice whatsoever" that "there remained the possibility that during the course of the contract several reserve Naval Construction Battalions might show up to train and be fed at Port Hueneme." <u>Id.</u> at 129. In fact, four reserve battalions trained and ate at the base during the contract year. The Court found that an effectively "zero estimate" of the number of reservists training and eating at the facility was unreasonable, and may have "actually misled the contractor." <u>Id.</u> at 142. The Court granted an equitable adjustment for the cost of feeding the four battalions. <u>Id.</u> at 148.

At first glance, the facts and reasoning of <u>Chemical Technology</u> appear to be relevant to the present case. However, the Court finds key distinctions that make those facts inapposite. First, the solicitation in <u>Chemical Technology</u> provided "no notice whatsoever" to offerors that a volume variation might occur due to the influx of reservists to the mess hall. In contrast, the offerors in this case were well aware of volume variations in the processing of surplus property. Agility offered no evidence that a specific type of foreseeable event, of which it was completely unaware, caused the workload increases. Second, the CWO in <u>Chemical Technology</u> ignored a Naval Supply Systems Instruction to provide offerors with estimates of Special Events. Agility has proffered FAR regulations and case law outlining the Government's duty to use information reasonably available to it, but these broad requirements do not amount to a specific failure to adhere to regulations and put offerors on notice of special events that occurred in <u>Chemical Technology</u>. Importantly, the Court in <u>Chemical Technology</u> only awarded an equitable adjustment for the cost of feeding the four reserve battalions at the base. Here, in contrast, Agility points

16

to no specific cause-and-effect links to isolate its damages; instead, Agility claims the inadequacy of the workload data constituted general negligence that affected the entire solicitation and caused the ensuing contract performance issues. Third, <u>Chemical Technology</u> was decided in 1981 under the then-current leading case of <u>Womack</u>, 182 Ct. Cl. at 413. The Court now looks to the Federal Circuit's more recent decision in <u>Medart</u> as the lead case for negligent estimate claims.

Under the holding in <u>Medart</u>, the fact that other methods of providing information to offerors "might have improved the accuracy of the government estimates . . . does not mean the approach selected was not reasonable." 967 F.2d at 581-82. When the scope of a contract is extensive or complex, like the unpredictable demilitarization of vehicles, weapons and other property in the Middle East, there may be "no central point to obtain accurate predictions of orders." <u>Id.</u> at 582. In that case, if the Government "used information that was reasonably available[,] . . . it need not search for or create additional information." <u>Id.</u> The Government here used reasonably available historical data and did not negligently estimate its needs in the Solicitation.

### 3. Breach of Warranty of Reasonable Accuracy

Alternatively, Agility contends that it is entitled to an equitable adjustment due to an alleged breach of the warranty of reasonable accuracy. The warranty of reasonable accuracy is a corollary to the concept of negligent estimate, which applies even in the absence of a finding of fault. <u>See</u> <u>Troise v. United States</u>, 21 Cl. Ct. 48 (1990). However, to prevail on this theory, Agility must prove that DRMS made a material representation as part of the Solicitation, without a caveat or disclaimer, upon which Agility actually and justifiably relied, to its detriment. <u>See, e.g.</u>, <u>Everett Plywood & Door Corp. v. United States</u>, 419 F.2d 425, 431, 190 Ct. Cl. 80, 92 (1969).

This theory does not aid Agility. The Government expressly declined to provide estimates to offerors, and thus cannot be held to have made a material representation upon which Agility could have justifiably relied to its detriment. Instead, the Government provided reasonably accurate historical information and asked offerors to form their own estimates. <u>See</u> <u>Cedar Lumber, Inc. v. United States</u>, 5 Cl. Ct. 539, 546 (1984) (stating that "if the purchaser warrants in the contract that it relies on its own information for bidding purposes and not on the information embodied in a government estimate . . . the warranty of reasonable accuracy in the bidding estimate will be a nullity.") (citations omitted). The Court finds no breach of a warranty of reasonable accuracy by the Government.

### F. Equitable Adjustment for Post-March 2009 Work

Agility's claims for equitable adjustment for work performed after the March 2009 contract modification depend largely on its theories of recovery for work performed prior to the modification. As the Court has found that Agility is not entitled to recovery for its

pre-March 2009 claims, it must also find that Agility fails on its post-March 2009 claims. The Government did not negligently estimate the workloads or constructively change the contract. Therefore, Agility is not entitled to recover damages for initially relying on the historical workload data and later augmenting its staff for Fiscal Year 2008. Agility voluntarily entered into the bilateral modification and was compensated according to the modification's terms.

<u>Conclusion</u>

The ultimate goal of an equitable adjustment is to do equity. <u>Ralph L. Jones Co., Inc. v. United States</u>, 33 Fed. Cl. 327, 331 (1995). Agility entered into a firm-fixed-price requirements contract with the Government for the operation of DRMO facilities at bases in the Middle East. The considerable risk of the contract is apparent on its face. The Government allowed the contractor to keep all proceeds from scrap sales in order to offset at least some of the risk. Although Agility faced workloads significantly in excess of what it anticipated, Agility still received over $44 million in scrap proceeds over the 27 months of the contract. DX 7 at 11. The fact that the scrap proceeds were "22.9% lower" than Agility's projections does not move the equities in Agility's favor. <u>Id.</u> For the reasons stated above, the Court DENIES Agility's claim for an equitable adjustment, and the complaints are dismissed with prejudice.

IT IS SO ORDERED.

<u>s/ Thomas C. Wheeler</u>
THOMAS C. WHEELER
Judge

# In the United States Court of Federal Claims

**Nos.  13-55 C and 13-97 C**
**(consolidated)**

**AGILITY DEFENSE &**
**GOVERNMENT SERVICES,**
**INC.**

**JUDGMENT**

**v.**

**THE UNITED STATES**

Pursuant to the court's Opinion and Order, filed August 18, 2015, ,

IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that plaintiff's complaints are dismissed, with prejudice.

Hazel C. Keahey
Clerk of Court

**August 18, 2015**          By:     s/ Debra L. Samler

Deputy Clerk

NOTE: As to appeal, 60 days from this date, see RCFC 58.1, re number of copies and listing of all plaintiffs.  Filing fee is $505.00.

## **PROOF OF SERVICE**

I certify that a copy of the foregoing has been served upon the following counsel of record through the Court's electronic filing system on this the 21st day of December, 2015:

Michael Austin, Esq.
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044

/s/ W. Brad English
*Of Counsel*

# CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type volume limitations set forth in Fed. R. of App. P. 32(a)(7)(B).  This brief contains 13,062 words, excluding the parts of the brief exempted by Fed. R. of App. P. 32(a)(7)(B)(iii) and Fed. Cir. R 32(b).

I hereby certify that this brief complies with the typeface requirements of Fed. R. of App. P. 32(a)(5) and the type style requirements of Fed. R. of App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word in Font 14, Times New Roman.

*/s/ W. Brad English*
W. Brad English
**MAYNARD, COOPER & GALE, P.C.**
655 Gallatin Street
Huntsville, Alabama 35801
(256) 551-0171
benglish@maynardcooper.com

Attorney for Appellant

Dated December 21, 2015.